(No. 14051.—Judgment affirmed.)

THE PEOPLE OF THE STATE OF ILLINOIS, Defendant in Error, *vs.* JAMES DELORENZO *et al.* Plaintiffs in Error.

*Opinion filed October 22, 1921—Rehearing denied Dec. 9, 1921.*

1. CRIMINAL LAW—*guilt may be established by circumstantial evidence.* Guilt of a defendant charged with a criminal offense may be proved by circumstantial evidence if the circumstances proved are sufficient to produce a moral certainty of guilt beyond a reasonable doubt.

2. SAME—*jury must determine the credibility of witnesses.* In trials before a jury, where the evidence is conflicting on questions of fact, it is the province of the jury to determine the credibility of the witnesses and to determine whether a fact alleged or crime charged has been proved.

3. SAME—*when, only, will reviewing court reverse judgment on the evidence.* A reviewing court is not bound by the verdict and judgment of conviction in a criminal case, but it will reverse the judgment on the evidence only where it can say that from a consideration of the whole testimony there is a reasonable and well founded doubt of the defendant's guilt.

WRIT OF ERROR to the Circuit Court of Rock Island county; the Hon. EMERY C. GRAVES, Judge, presiding.

KENWORTHY, DIETZ, SHALLBERG, HARPER & SINNETT, and WILLIAM B. SCHRODER, for plaintiffs in error.

EDWARD J. BRUNDAGE, Attorney General, BENJAMIN S. BELL, State's Attorney, and FLOYD E. BRITTON, (EDWARD L. EAGLE, of counsel,) for the People.

Mr. JUSTICE FARMER delivered the opinion of the court:

This writ of error was sued out to review a judgment of conviction of James Delorenzo and Dominick Delorenzo, who are brothers, for the murder of Angelo Frenchevilla. The dead body of Frenchevilla was found by his wife between one and two o'clock in the morning of the night of

August 24, 1920. He worked at the gas plant in Moline from one o'clock P. M. till 10:30 P. M. While returning home from his work the night of August 24 he was waylaid at a dark place in the railroad yards on his route home and shot to death. His wife becoming uneasy about his delay in returning home, went to look for him and found his body as stated. This was in the neighborhood of two o'clock in the morning. The condition of the body indicated he had been dead some hours. The body was slightly warm and *rigor mortis* had not set in. There were several bullet wounds in the body, most of which would cause death. Defendants were suspected of the crime, and on inquiry and search the police officers of Moline learned they had left for Beloit, Wisconsin, on an early train the morning after the homicide. The police of Beloit were requested by the police of Moline to apprehend defendants and take them into custody. They did so about noon, August 25, notified the police of Moline, and officers went to Beloit and brought them back to Moline. They were held in custody until their indictment and trial, in November, 1920. They were both found guilty by verdict of a jury and their punishment fixed at imprisonment for life.

Reasons assigned for a reversal of the judgment are, that the evidence was not sufficient to warrant a conviction, the court erred in ruling on the admissibility of testimony and in giving and refusing instructions.

Complaint is made that errors were committed by the court during the progress of the trial, but the argument of defendants is principally devoted to the claim that the evidence did not warrant the verdict and judgment. No one saw the homicide committed, or saw defendants, or either of them, in the vicinity where the body was found. Defendants are brothers and lived in Silvis, which is a division point on the Chicago, Rock Island and Pacific railroad, about seven miles east of where the body was found. James

Delorenzo had worked at the roundhouse there about twelve years. Dominick had worked part of the time at the roundhouse and part of the time at the gas plant in Moline, where deceased was employed and with whom he worked for a few days. His last employment was at the Moline power plant. James Delorenzo was a married man and lived in his own house in Silvis. His brother, Dominick, was unmarried and lived with James. The deceased and his family formerly lived in Silvis and he worked in the roundhouse while living there. He and his family, James Delorenzo and his family, and Dominick, were well acquainted and on friendly terms until some time before deceased and his family moved to Rock Island,—a little more than a year before the homicide. James Delorenzo had boarded a year and a half with the family of deceased. Some time about a year prior to the homicide, defendants, or one of them, caused the arrest of Joe Paddis on a charge of rape on the wife of James Delorenzo. Deceased signed Paddis' bail bond, and this disturbed the friendly relations of defendants and deceased. In August, 1919, James found his wife and deceased on a train about to leave Moline and suspected they were eloping. He took his wife off the train and told deceased not to come about his house any more. After that time defendants and deceased did not speak to each other. Dominick worked at the gas plant where deceased was employed, and said he worked in the same gang with him four days but would not speak to him. The wife of James was some time before the homicide sent to the Watertown State Hospital for the Insane and was there when the killing occurred. James testified he blamed deceased and Paddis 'for his wife being sent to Watertown. Defendants testified they had decided to leave Silvis some days before the shooting and began making their prepara-· tions. Dominick was going back to Italy and James was going to Florida to buy a farm. They had a cousin living in Beloit. Dominick testified he made application there,

July 27, for a steamship ticket to Italy, and August 2 or 3 he applied through the clerk of the circuit court of Rock Island county for a passport and subsequently received it. James quit work two days before the homicide and Dominick one day before. James rented his house and sold or stored most of his furniture. They packed their belongings in trunks, took them to the railroad station in East Moline and checked them for Beloit. James had shortly before procured a pass to Beloit and return. Dominick bought a ticket. Before their departure James removed from the bank where he kept his money, $1572 and $200 in liberty bonds. Dominick took from the bank his money, $1132, and $100 in liberty bonds. These amounts of money and bonds were found on their persons when they were arrested in Beloit. Both defendants testified they stayed around their house in Silvis the early part of the evening of August 24 and went to bed in the same room shortly after eight o'clock and slept until two o'clock, when they got up, washed, ate something and took a street car to East Moline, and on alighting from the car went to the depot, boarded a train at 4:05 A. M., arrived at Beloit at 9:15 A. M. and went to their cousin's home.

On behalf of the People the widow of deceased testified her husband and defendants had trouble when she and her husband lived in Silvis, a year before her husband was killed, and that Dominick told her he would kill her husband.

At the time the body of deceased was found his cap was lying near it, and another cap was found thirty or forty feet from the body. The caps were produced at the trial, and the widow testified one of them belonged to her husband and the other belonged to James Delorenzo; that she had seen him wear it in Silvis. The size of the cap was seven and one-eighth, and the proof showed that was the size of the hat worn by James.

There is a dispute between counsel for the respective parties as to the number of bullets that struck the body of

deceased. Dr. Wood, who examined the body and probed the wounds at the coroner's inquest, testified there were five wounds. Four bullets penetrated the body,—one passing clear through and one appeared to be a glancing wound. Zong, night driver for the Moline police, testified there were six wounds, one of which was in the back, and that the wounds were all powder-burned. Dr. Wood also testified there were powder marks on the skin of deceased. Dr. Wood testified to an examination of the wounds, which was of a character that afforded him means for being accurate in his statement. He extracted two of the bullets from the body and examined and probed the other holes or openings in the body. It is evident from Zong's testimony he did not examine the body very carefully. He says it had been shot six times, once in the back, and that there were powder burns around all the wounds. As we understand it, he was sent from the police station to remove the body to the undertaker's. While this question is not a vital point in the case, it is argued with much earnestness by plaintiffs in error, for reasons that will hereafter appear, that six bullets were fired into the body of deceased. We are of opinion the most reliable testimony shows there were only five. Witnesses on behalf of the State testified the bullets taken from the body of deceased were 38-caliber.

Police officer Schultz, of Beloit, testified that when he arrested defendants at that place, August 25, Dominick Delorenzo had a revolver, which he identified as the one exhibited and introduced in evidence at the trial. It was clean, newly oiled and loaded, but he did not remember the number of cartridges. James Delorenzo had a knife. These weapons were taken from them and locked up in the safe of the chief of police. The revolver fired a 38-caliber cartridge. In one of the trunks the officers took possession of in Beloit were found thirty-five or forty cartridges, 38-caliber. They were found in Dominick's trunk. The police

officer in Beloit who arrested defendants testified that Dominick did most of the talking. They were in company with their cousin at the time and Dominick said they all three were going to Italy. Nothing was said about James going to Florida. In addition to the articles before mentioned as having been found in the possession of defendants when they were arrested, was a railway pass to James from Beloit to Rock Island; a receipt from the Bethany Home for Children for six months' board for James' child, which was in the home; a storage receipt from the Sackville Storage Company of East Moline, and a receipt for a safe deposit box from a bank in East Moline. Dominick told the officers the gun was his; that he had cleaned and oiled it before they left Silvis, and he carried it for protection because they had considerable amounts of money on them. The chief of police of Moline went to Beloit and brought defendants back. He testified in his talk with them at one time they said that on account of their having large sums of money on their persons they did not tell anybody where they were going.

Mrs. Lucile Stee testified her father owned a store in Silvis and that the family lived in a house near the store; that the house of James Delorenzo was between the witness' home and the store but was farther back from the street than her home and her father's store. The store and Delorenzo's house were in plain view from witness' home. She knew and often saw the defendants. She saw them around their house about dusk, August 24, dressed up in their good clothes. About August 9 or 10 Dominick told witness they were tired of keeping batch and were going to East Moline to room and board. The witness wished to buy a small residence and defendants talked with her about selling her James' house and furniture. On examination they did not suit her and she did not buy.

Mrs. Kelter, mother of Mrs. Stee, testified she saw defendants often; that James wore a cap, which looked like

300—9

the one found near deceased's body and offered in evidence. She testified that about August 8 Dominick talked with her about renting the Delorenzo house and selling the furniture. He said they were going to East Moline to live with some friends. Nothing was ever said to witness about either of them going to Italy or Florida.

Defendants at all times denied their guilt, and both testified on the trial that they did not kill Frenchevilla and knew nothing about the homicide. They testified they had both decided to leave Silvis,—Dominick to return to Italy and James to go to Florida to examine some land with a view to purchasing it. James' wife was in an insane hospital, and his daughter, an only child, was in a home for children. They had a cousin in Beloit, and the application for a steamship ticket for Italy for Dominick was made from that place, and, as we understand it, was sent by the steamship company to its agent there. The ticket was issued August 4, and was secured, as we understand, by the Beloit police from the agent at that place of the steamship company and was introduced in evidence. Dominick also had a passport. Defendants quit their jobs where they had previously been employed and made preparations for an absence for a considerable period of time. The residence of James was rented for six months, and August 24 he stored two boxes of goods in a warehouse, paying six months' storage in advance. Other acts of the parties showed they contemplated a protracted absence. This is not denied by defendants, but they claim there was no secrecy about their preparations and that such acts were necessary in view of their contemplated long absence, and that one of them intended going to Italy, which he could not do without a passport in addition to his ticket. Preparations for his journey required application in advance to the steamship company for a ticket and to the government for a passport. The former was made in July, 1920, and the latter early in August. It is clear Dominick had prior

to August 24 made the necessary preparations for a trip to Italy. Just why the application for a steamship ticket was made from Beloit instead of the place of his residence does not appear, except defendants claim they had a cousin at Beloit whom they wished to visit and who also contemplated going to Italy. It does not appear from the record that defendants told anyone in Silvis that either of them was going to Italy. James testified he told a party named Guyer that he was going to Florida, and that he told "a couple of fellows" he was going South to buy a farm, and that he told the foreman where he was employed he was going to Beloit to see his cousin and then was going to buy a farm. He admitted telling Mrs. Kelter and Mrs. Stee he was going to live in Moline with friends. Dominick admitted he owned the revolver and testified it had not been fired since the fourth of July. He denied telling the widow of deceased he would kill her husband.

It clearly appears from the testimony that there was an unfriendly and rather bitter feeling on the part of defendants toward the deceased. Soon after the time the trouble between defendants and deceased arose deceased quit his work in the roundhouse in Silvis, where defendants were also employed, moved his family to Rock Island and entered the employment of the gas company at Moline. James Delorenzo said in his testimony that he had told deceased not to come to his house; that he blamed him for his trouble with his wife and for her being sent to the Watertown State Hospital for the Insane. Both defendants admitted they would not, since the trouble between them occurred, speak to deceased. Dominick testified he worked for a while for the same gas company deceased worked for, and for a few days in the same gang with him, but he never spoke to him, and quit that employment because deceased was there and because he could get better wages from another employer.

That Frenchevilla was assassinated cannot be, and is not, questioned. There was no direct proof as to who assassinated him, but guilt of a defendant charged with a criminal offense may be proven by evidence circumstantial in its character if the circumstances proven are sufficient to produce a moral certainty of guilt beyond a reasonable doubt. (*Carlton* v. *People,* 150 Ill. 181; *Otmer* v. *People,* 76 id. 149.) In trials before a jury, where the evidence is conflicting on questions of fact, it is the province of the jury to determine the credibility of the witnesses testifying in the case and determine whether a fact alleged or crime charged has been proven. The jury see the witnesses while giving their evidence, which is recognized universally as being a great aid in determining the weight and credit that should be given their testimony. It is true, a reviewing court is not bound by the verdict and judgment of conviction in a criminal case and will reverse the judgment where the evidence is so inconclusive or unsatisfactory as to leave a reasonable doubt of defendant's guilt, but it is only when the reviewing court can say that from a consideration of the whole testimony there is a reasonable and well-founded doubt of defendant's guilt that the judgment will be reversed. *People* v. *Schoop,* 288 Ill. 44, and cases cited; *People* v. *Rischo,* 262 id. 596.

It is argued for defendants that the cap found near where the crime was committed, and introduced in evidence as the cap of James Delorenzo, was not proven to be his cap; that the testimony of the widow was hysterical, unreliable and unworthy of belief; that Mrs. Kelter, the only other witness for the State who testified to its being James' cap, only testified it looked like one she saw him wear. It is also argued that the revolver Dominick had when arrested had only five chambers while there were six wounds in the body of deceased, and that when found the revolver had been cleaned and oiled and bore no evidence of having been recently fired. The jury saw Mrs. Frenchevilla and

were better able than we are to judge her condition and reliability. She testified she had seen James Delorenzo wearing the cap, and Mrs. Kelter testified it looked like one she had seen him wear. It was the same size as the hat he wore when taken into custody. We think the better and more reliable testimony, before referred to, shows there were only five wounds in the body of deceased, and that the fact that the revolver had been recently cleaned, oiled and had all its chambers loaded when taken next day from Dominick, is not, in itself, sufficient to raise a reasonable doubt. Considering all the facts and circumstances proven, we are of opinion this court would not be warranted in reversing the judgment on the testimony.

Complaint is made by counsel here, who did not represent defendants at the trial, of rulings of the court in the admission of evidence and cross-examination permitted the People. Some of the complaints are not preserved for review by objections and exceptions, and in our opinion all of them are of a more technical than meritorious character.

Much of defendants' brief is devoted to a criticism of the instructions given for the People. We shall not discuss the objections in detail. It is sufficient to say we do not see any reasonable basis for saying defendants were prejudiced by the instructions. Most of them were substantially stock instructions given in criminal cases and have been approved in substantially or exactly the same form in previous decisions of this court.

We are satisfied there was no error committed during the progress of the trial which affords any reasonable or sufficient ground for a reversal of the judgment, and it is affirmed.                    *Judgment affirmed.*