(No. 32595.—

THE PEOPLE OF THE STATE OF ILLINOIS, Defendant in Error, *vs.* GEORGE GILBREATH, Plaintiff in Error.

*Opinion filed November 18, 1953.*

JULIUS LUCIUS ECHELES, of Chicago, for plaintiff in error.

LATHAM CASTLE, Attorney General, of Springfield, and JOHN GUTKNECHT, State's Attorney, of Chicago, (JOHN T. GALLAGHER, RUDOLPH L. JANEGA, and ARTHUR F. MANNING, all of Chicago, of counsel,) for the People.

Mr. JUSTICE BRISTOW delivered the opinion of the court:

George Gilbreath seeks here a reversal of the judgment entered in the criminal court of Cook County wherein he was sentenced to serve 25 years in the penitentiary. He was found guilty, after a trial before the court without a jury, of the crime of selling two capsules of heroin, a narcotic drug, to a person under 21 years of age.

The prosecution was predicated upon an alleged violation of section 23 of the Uniform Narcotic Drug Act, (Ill. Rev. Stat. 1951, chap. 38, par. 192.23,) which states: "Whoever violates this Act by selling, * * * or dispensing any narcotic drug to any person under 21 years of

age, shall be imprisoned in the penitentiary for any term from 2 years to life."

The evidence supporting the prosecution may be briefly summarized as follows: Phillip Petress, a lad of fifteen years, accompanied by two police officers of the city of Chicago, Kilmer and Sykes, went to 2047 West Madison Street on May 4, 1951, around noon. Phillip left the officers and contacted a Homer Stigger from whom he sought to buy the drug. He came back to the officers and requested $2.50 to pay for the drug and, later, fifty cents more. Stigger momentarily disappeared and returned with two capsules of white powder for which the boy paid $3. The capsules were turned over to officer Sykes who later had an analysis made of them in the crime laboratory of the Chicago police department, at which time it was ascertained that they contained heroin, an alkaloid of opium drug.

Officer Kilmer's testimony was corroborative of the boy's narrative. Homer Stigger testified that he is a defendant in the cause, but that he had been tried elsewhere in another court; that he had met the Petress boy about noon on May 4; and that he later met a person by the name of Ben Randle, who gave him a package wrapped in bread paper; that he did not know the nature of its contents; but that he later sold the package to the Petress boy for $3; and that subsequently he went to a tavern and met Randle, to whom he gave the $3, and received in return fifty cents.

Ben Randle, appearing for the prosecution, testified that he is a defendant in the case, and that he pleaded guilty before another judge, but that he had not yet been sentenced. Randle being the only witness appearing for the prosecution that connects the defendant with the crime, it is well that we examine his testimony critically. He said that he had known Homer Stigger for about five months and saw him almost daily at 2047 West Madison Street; that he had known George Gilbreath for about a year;

that he saw Gilbreath at 8:30 on the morning of May 4, 1951; that Gilbreath gave him a package containing two capsules to get rid of, but that he stated he did not know what they contained; that Gilbreath told him to sell the package for $3; that at noontime he gave Stigger the package and later on, in a tavern, he received $3 from Stigger, of which he gave him back fifty cents. That same afternoon the defendant asked him if he had gotten rid of the package, and he told him that he did and handed him the $3.

George Gilbreath, testifying in his own behalf, said that he had known Ben Randle for about six or eight months, that he had known Randle as a bartender in a tavern at 2047 West Madison Street; that he had not visited Randle's home on the morning of May 4, 1951, because he was sick at home all day; that he did not give Randle the two capsules comprising People's exhibit 1 that day or any other day. Gilbreath further testified that Randle had told him that his only reason for testifying against him was because they had promised him probation and that this statement was made to him while he and Randle were in the county jail.

Clarence Brown testified that he was in the same tier in the county jail with defendant Gilbreath and Ben Randle; that Ben Randle told him that the reason he was testifying against Gilbreath was because the police were threatening that his wife was going to be locked up and that she was pregnant. He further testified that Randle told him that he was promised probation for testifying against the defendant.

Ode Elleck testified similarly that he had not known either Gilbreath or Randle before they came to his tier in the county jail; that he wrote letters for Randle because of Randle's inability to write; that he wrote a letter to Randle's wife at Randle's dictation on or about June 17, 1951; and at that time he wrote Randle's wife stating to

her that Randle was not going to testify against George Gilbreath because he thought that Gilbreath was getting a raw deal and that the only reason he was testifying against Gilbreath was that he was afraid they would hold his wife, who was pregnant, in jail.

Lettrell Everly also testified that he was in the same tier with Gilbreath and Randle in the county jail; that he talked with Randle about the case and that Randle told him that the only reason that he was appearing against the defendant was because the police had made certain threats.

Stella Randle testified in rebuttal that she had received letters dictated by her husband and written by Elleck, but none contained any information about Gilbreath; that she had been in jail but at present was now out on bond.

The court entered a finding of guilty. The defendant made a motion for a new trial, setting forth seventeen assignments, one of which was predicated upon newly discovered evidence. Attached to the motion was an affidavit of Ben Randle, stating that he had been promised probation in consideration of his appearance against defendant Gilbreath; that all statements signed by him implicating Gilbreath were untrue, and, quoting: "Affiant now states the fact to be that said testimony accusing George Gilbreath of giving to him on the 4th day of May, 1951, or any other date, the said narcotic drug, was false, and affiant knew that they were false at the time the testimony was given. Affiant further states the fact to be that he did not on May 4, 1951, get any narcotic drug from George Gilbreath."

On consideration of this motion for a new trial, this colloquy occurred between Keys, counsel for defendant, and the court: "Mr. Keys: I should like to have leave to argue the Motion for a New Trial. The Court: I think it would be a waste of time. Mr. Keys: May we have the privilege— The Court: No, Motion for New Trial is denied. I have heard the evidence and find from the evi-

dence—I have been very careful that no error crept in the record." Thereupon the defendant was sentenced to serve a term of 25 years to life in the State penitentiary.

This cause was argued orally, on review, by both counsel for plaintiff in error and defendant in error. In that argument it was mentioned that Randle had been sentenced to serve a minimum of fifteen years, but that on a post-conviction hearing, he was granted probation. These circumstances are also mentioned in the defendant's brief. Not being a part of the record it would be improper for us to give consideration to them.

We are mindful of what we have repeatedly asserted, that a conviction may be sustained on the uncorroborated testimony of an accomplice. Likewise, such testimony must be scrutinized carefully and is ofttimes looked upon with grave suspicion. Randle, the accomplice in this case, is markedly weak in enlisting our confidence. He testified that he did not know that it was a narcotic drug that he was handling. That does not seem plausible. Three fellow travelers in the jail said that Randle told them, in effect, that he was going to falsely accuse the defendant in his testimony. Coming from jail to testify may not be the best recommendation for their credibility, but that is, as far as the record demonstrates, the only reason for the trial court to disbelieve them. Finally, we have Randle's own confession under oath that he had corruptly perjured himself in his testimony against the defendant. We believe it would be a bad precedent to sustain a conviction upon such unsatisfactory proof. A new trial may clarify the situation.

The judgment is reversed and the cause remanded for a new trial.

*Reversed and remanded.*