(No. 36025.—

THE PEOPLE OF THE STATE OF ILLINOIS, Defendant in Error, *vs.* GEORGE NORMAN, JR., Plaintiff in Error.

*Opinion filed March 23, 1962.—Rehearing denied May 23, 1962.*

YONEO FUKUDA, of Chicago, appointed by the court, for plaintiff in error.

WILLIAM G. CLARK, Attorney General, of Springfield, and DANIEL P. WARD, State's Attorney, of Chicago, (FRED G. LEACH, Assistant Attorney General, and JOHN T. GALLAGHER and DEAN H. BILTON, Assistant State's Attorneys, of counsel,) for the People.

Mr. JUSTICE SCHAEFER delivered the opinion of the court:

George Norman, Jr., was tried before a judge of the criminal court of Cook County for unlawfully dispensing narcotics to Leroy Burrows. He was convicted and sentenced to the penitentiary for a term of not less than ten nor more than twenty years. On this writ of error he asserts that certain evidence was erroneously admitted against him, that his guilt was not established beyond a reasonable doubt, and that the court erred in permitting a narcotics agent who had been present throughout the trial to testify.

The alleged sale of narcotics took place on June 18, 1959, in Burrows's apartment in Chicago. Burrows was a user and seller of narcotics who had been arrested by Federal narcotics agents and had offered to cooperate with them in the apprehension of narcotics sellers. On June 18, James Bailey, a Federal agent, went to Burrows's apartment. Shortly after he arrived, Burrows received a phone call, and about fifteen minutes after the phone call the

defendant arrived. In the interim, Bailey had searched Burrows and conducted a cursory search of the apartment, and had then secreted himself in the bathroom.

Bailey testified that he was able to hear Burrows and the defendant as they sat on a couch in the living room, and that by standing in the bath tub and using a hinged cabinet mirror he could see them. Both Burrows and Bailey testified that after some conversation about Burrows's recent arrest, the defendant said that he had Burrows's "stuff" and asked Burrows if he had the "bread." When Burrows said he did not, the defendant said that would have to see if it would be "okay to do it that way." He made a phone call and asked if it would be "okay" to give it to Burrows on "tick" since he did not have the "bread." The defendant then reported that it was "okay" and that he would give Burrows "this one now." Burrows testified that the defendant then handed him a tinfoil package which he placed on the cocktail table. Bailey testified to the conversation but did not see anything pass from the defendant to Burrows. Immediately thereafter the defendant and Burrows left the apartment and walked into the hall. Bailey entered the living room and found a silver tinfoil container lying on the cocktail table.

He conducted a field test which indicated that the tinfoil package contained narcotics. He then returned to the office of the Federal Bureau of Narcotics where he placed the tinfoil package in a sealed "lock seal" envelope, which was described as a type of envelope which could be opened only by breaking the seal or by cutting the envelope. In either case it would be apparent that the envelope had been opened. Bailey then put the sealed envelope in a locked metal container in his desk. On the following day he took the white powder from the tinfoil package and placed it in a glassine bag. He then weighed, sealed and initialed the glassine bag in the presence of another agent, Arpaio, who also initialed the bag. Bailey filled out a yellow slip describ-

ing what had been done, and placed the glassine bag in another lock seal envelope and delivered it to John Endriz, a government chemist.

Endriz testified that he received the lock seal envelope from Bailey on June 19, but that he did not open it on that date. Instead, he turned it over to a secretary. He thought the secretary was a Miss Washington, but there had been a change in personnel about that time, and he was not sure. Endriz next saw the lock seal envelope in his laboratory compartment on June 30. He testified that it was in the same condition as when Bailey originally delivered it to him, and that it showed no signs of tampering. He conducted a series of qualitative tests which showed that the white powder was heroin. After those tests were made, the unsealed envelope containing the heroin remained on Endriz's desk until July 8 when he conducted a quantitative test to determine how much heroin was present. The powder was then reweighed and placed in another sealed envelope which was deposited in the government vault, where it remained until the trial.

The defendant was arrested on July 20, 1959, but he was released after an overnight stay in jail when he undertook to cooperate with the authorities. On August 17 he was rearrested and his indictment and trial followed. He testified both that he had been in Burrows's apartment on June 18 and that he had not, but he denied that he had sold or dispensed any narcotics to Burrows on that date. One of the agents testified that after his arrest on July 20, the defendant said, "I knew that Leroy was working for you. You got me up tight. I knew that I should not have sold him that day." When the defendant testified, he did not deny that he had made that statement.

The defendant contends that it was error to admit in evidence the contents of the tinfoil package and the testimony of the chemist as to their analysis. He bases this contention first on the fact that Burrows did not identify the

tinfoil package as the one that the defendant handed to him. This contention is adequately answered by Burrows's testimony that he placed the tinfoil package on the cocktail table and by Bailey's testimony that he picked it up almost at once. No one had access to the package during the interim, since Bailey, Burrows and the defendant had been the only persons in the apartment.

The defendant also emphasizes that no evidence was introduced to show the whereabouts of the contents of the tinfoil package between June 19 and June 30, and that the powder that Endriz had analyzed qualitatively on June 30 remained in an unsealed envelope on his desk until July 8, when he made his quantitative analysis.

As indicated in *Woolley* v. *Hafner's Wagon Wheel, Inc.,* 22 Ill.2d 413, whether the necessary foundation for the admissibility of a laboratory report has been established "must necessarily depend on the facts involved." The evidence establishes that the powder contained in the tinfoil package was turned over to the chemist in an envelope specially designed to prevent tampering and to reveal signs of attempted tampering. Although the record does not show the precise whereabouts of that envelope from June 19 to June 30, the chemist testified that when he opened the envelope for analysis on June 30, it showed no signs of tampering and was in the same condition as when it was first delivered to him. Bailey's identification of the envelope, by his writing and initials, as the same one that he had given to the chemist on June 19, buttresses the testimony of the chemist. In the absence of any suggestion of substitution, alteration or any other form of tampering, we are of the opinion that the protective techniques employed were sufficient to make admissible the testimony of the chemist as to the result of his qualitative analysis.

The case stands otherwise as to the quantitative tests performed by the chemist on July 8, and as to the powder itself. The lock seal envelope had been opened on June 30

and its contents had lain on the chemist's desk until July 8. So far as the record shows there was no effective protection during this period. But there was no testimony as to the result of the quantitative test, and under the statute it was not necessary for the prosecution to establish in the first instance the quantity of heroin involved. Ill. Rev. Stat. 1959, chap. 38, par. 192.28—3; *People* v. *Palumbo,* 5 Ill.2d 409, 416.

The powder contained in the glassine bag should not have been admitted in evidence. It lay unprotected on the chemist's desk for a long period, and the record affords no satisfactory assurance that it is the same powder that was delivered by the defendant to Burrows. Failure to exclude the powder, however, was not reversible error. The defendant's guilt depended upon the testimony of the witnesses as to what transpired between the defendant and Burrows, and upon the chemical composition of the substance that passed from the defendant to Burrows. It did not depend upon preservation of a portion of that substance for physical identification at the trial.

The defendant also urges that the evidence did not establish his guilt beyond a reasonable doubt. This contention rests largely on the fact that Burrows was an admitted narcotics seller who acknowledged that he was testifying under threat of prosecution by Federal and State authorities. But his testimony was corroborated by that of Bailey who heard the entire conversation between the defendant and Burrows, and who saw part of the transaction. The trial judge permitted a full inquiry into the circumstances of which the defendant complains, and we can not say that his appraisal of the credibility of the witnesses was erroneous. (*People* v. *Greer,* 20 Ill.2d 370; *People* v. *Villalobos,* 20 Ill.2d 315.) There were also some minor inconsistencies in the testimony of the agents of the Bureau of Narcotics, but these variations do not bear upon the essential question whether the defendant delivered narcotics to Burrows, nor

do they raise doubts about the veracity of the testimony of the agents. See *People* v. *Golliday,* 20 Ill.2d 29.

The court did not err in allowing agent Arpaio, who was in the courtroom throughout the trial, to testify. When the trial began the court had ordered all witnesses excluded from the courtroom, except one officer who was not present at the "occurrence." Agent Arpaio remained in the courtroom and subsequently testified. But he was not present when the heroin was delivered, and there was no error or inconsistency in permitting him to testify.

The judgment of the criminal court of Cook County is affirmed.

*Judgment affirmed.*