**People of the State of Illinois, Defendant in Error,
v. Julius Brown, Plaintiff in Error.**

**Gen. No. 51,920.**

First District, Fourth Division.

April 17, 1968.

John R. Sullivan, of Chicago, for appellant.

John J. Stamos, State's Attorney of Cook County, of Chicago (Elmer C. Kissane and Carl M. Walsh, Assistant State's Attorneys, of counsel), for appellee.

MR. JUSTICE ENGLISH delivered the opinion of the court.

CRIME CHARGED

Unlawful sale of a narcotic drug.

JUDGMENT

After a bench trial, defendant was found guilty and sentenced to a term of eleven and one half years to twenty years.

CONTENTIONS ON APPEAL

(1) Entrapment.

(2) The substance received in evidence was not proved to be heroin as defined by statute.

(3) The chain of possession of the alleged narcotic was not sufficiently established.

EVIDENCE

*Thomas E. Manson,* for the State.

On March 6, 1962, he was a narcotics inspector for the State of Illinois. On that date he met John Melkonian, who he believed was an addict. Melkonian was in the employ of the State Narcotics Bureau at that time, receiving payment for information and services.

The two men drove to the area of 1642 West Warren Boulevard, where Melkonian left the car and entered a building. About fifteen minutes later he returned to the car. After another five minutes defendant emerged from the building and entered the same car.

Melkonian introduced Manson to defendant as "Joey from Melrose Park." In reply to defendant's inquiry as to what he wanted, Manson requested "half a sixteenth," whereupon defendant asked for $20, which Manson gave him.

They then drove to Orchard and Clybourn Avenues where defendant left the car, returning some fifteen minutes later with a small aluminum foil packet which he

gave to Manson. Defendant was driven back to the Warren Boulevard address.

Manson and Melkonian proceeded to Laflin and Madison Streets where Manson opened the foil packet and made a "field test" of the white powder inside for the presence of narcotics. There was a reaction. Manson retained possession of the foil packet and the powder until the following day when he took the powder from the packet, poured it into a glassine bag, weighed it, and initialed the bag and the aluminum foil wrapper. Both articles were sealed in a lock-seal envelope. Later that day he delivered this envelope to the United States Chemist.

*John Melkonian,* for the State.

His testimony substantially corroborated that of Manson.

*Donald Norton,* for the State.

He was also a State narcotics inspector. He picked up two sealed envelopes, stapled together, from the United States Chemist's office on the day of the trial, and brought them to court.

*John D. Endriz,* for the State.

He was Assistant Chief Chemist employed by the United States Treasury Department. In the regular course of business a sample would be received at the laboratory, stamped with a laboratory number, and logged in the journal. It would then be taken to the narcotics section and placed in a trough with other samples.

The first time he saw the lock-seal envelope which Manson had delivered to the laboratory was on March 9. He got the envelope from the trough, broke the seal, subjected the powder in the glassine bag to laboratory analysis, and placed the remainder of the powder and the foil in another envelope which he sealed and stapled to the torn lock-seal envelope in which the same had been delivered to the laboratory. These envelopes were then placed in the vault until picked up by Inspector Norton.

Based on the laboratory tests which he performed, Endriz gave his opinion that the white powder contained heroin. On cross-examination he stated that the white powder could have been a synthetic heroin derivative, as he had not tested the material for synthetic character. The reaction observed by Manson when he made a "field test" of the powder indicated, though not conclusively, the presence of some sort of derivative of opium or morphine.

Endriz identified both envelopes, the glassine bag, and the aluminum foil wrapper as the same articles he had seen in the laboratory on March 9. In so testifying, he relied on the various identification marks which had been placed on the envelopes.

OPINION

 (1) Defendant's claim of entrapment is untenable. There is no evidence that the narcotics inspector did more than follow the commonplace, approved procedure of affording defendant an opportunity to commit the crime. Ill Rev Stats (1961), c 38, § 7–12; People v. Washington, 81 Ill App2d 162, 167–171, 225 NE2d 472, and cases there cited. Since the State's evidence did not raise the issue of entrapment, and since this is an affirmative defense, the burden rested on defendant to introduce some evidence of entrapment before he could require the State to undertake proof of its negative. Ill Rev Stats (1961), c 38, § 3–2. This he did not do, electing, instead, to present no evidence whatsoever.

 Furthermore, not having interposed the defense of entrapment in the trial court, defendant may not be heard to urge it on review. People v. Redding, 28 Ill2d 305, 192 NE2d 341; People v. Outten, 13 Ill2d 21, 147 NE2d 284.

(2) Defendant contends that the substance in evidence at the trial was not proved to be a narcotic drug as defined in the statute. Ill Rev Stats (1961), c 38, § 22–2(r)(4). However, Manson testified that when he made

a "field test" of the powder, he saw a reaction. Endriz, the chemist, testified that this reaction indicated the presence of an opium or morphine derivative. Also, Endriz testified that, on the basis of the laboratory analysis, he believed that the powder contained heroin, even though he did not make a test to determine whether or not it had been synthetically produced.

In People v. Harrison, 26 Ill2d 377, 186 NE2d 657, the court affirmed a conviction for the unlawful sale of a narcotic drug where the only evidence establishing the substance as a narcotic drug was the positive reaction to a "field test," and testimony that the substance was represented to be a narcotic at the time of sale.

More specifically, this court, in People v. Smith, 52 Ill App2d 321, 202 NE2d 63, held that:

> The unlawful sale of heroin, of itself and without any showing that the substance is opium or a derivative of opium, is sufficient to subject the seller to criminal penalties under the Uniform Narcotic Drug Act. The obvious intent of the statute is to prohibit the unlawful sale, not only of any compound, manufacture, salt, derivative, mixture or preparation of opium, but also morphine, codeine, and heroin.

We believe this conclusion to have been a sound one, based upon the same statutory definition as is applicable in the instant case, namely,

> "Opium" includes morphine, codeine, and heroin, and any compound, manufacture, salt, derivative, mixture, or preparation of opium, . . . . Ill Rev Stats (1961), c 38, § 22(r)(4).

The sale of heroin is thus proscribed regardless of whether it is derived from opium or produced synthetically. (3) Finally, defendant contends that chain of possession of the narcotics was not shown to have been unbroken. Defendant points to the period between the

71

time of the arrest and the time when Manson sealed the articles into the lock-seal envelope. Defendant further claims that the proof did not cover breaches in the chain occurring between the time the envelope was delivered to the laboratory and the time Endriz analyzed the powder, and between the time Endriz placed the envelopes in the vault and the time Norton called for them.

However, Manson testified that the articles were in his possession from the time he received them until he delivered them to the laboratory sealed in the lock-seal envelope. Endriz testified that this envelope was sealed and showed no signs of tampering when he opened it at the laboratory. He then broke the seal, analyzed the powder, and replaced all the items in another sealed envelope, attaching the first envelope to the new one.

The procedures followed in the handling of the narcotics samples in this case were approved in People v. Webb, 60 Ill App2d 365, 208 NE2d 639; People v. Norman, 24 Ill2d 403, 182 NE2d 188; and People v. Anthony, 28 Ill2d 65, 190 NE2d 837. Therefore, the question of whether continuity of possession was established beyond a reasonable doubt rests on the credibility of the witnesses Manson and Endriz, a matter essentially for the trial judge. We find no basis for disturbing his conclusion in this case.

The judgment of the Circuit Court is affirmed.

Affirmed.

McCORMICK, P. J. and DRUCKER, J., concur.