(No. 23082.—

THE PEOPLE OF THE STATE OF ILLINOIS, Defendant in Error, *vs.* ROBERT HICKS, Plaintiff in Error.

*Opinion filed December 19, 1935.*

RICHARD J. COONEY, and JOHN A. VERHOEVEN, for plaintiff in error.

OTTO KERNER, Attorney General, THOMAS J. COURTNEY, State's Attorney, and A. B. DENNIS, (EDWARD E. WILSON, HENRY E. SEYFARTH, RICHARD H. DEVINE, and JOHN T. GALLAGHER, of counsel,) for the People.

Mr. JUSTICE ORR delivered the opinion of the court:

A jury in the criminal court of Cook county found Robert Hicks guilty of murder and sentenced him to the penitentiary for a term of twenty years. He brings the case here by writ of error for review.

Samuel Cornfield, thirty-one years old, an employee of the Bowman Dairy Company, was shot and instantly killed near his milk wagon in the alley between Woodlawn and Kimbark avenues, in Chicago, at about 7:00 o'clock A. M. on May 7, 1934. His body was removed to an undertaker's, and a wrist watch, a knife and twenty-four cents were found on his person. No eye-witnesses to the shooting were produced at the trial of the case. Hicks relied principally upon an alibi defense, to the effect that he was at home with his wife and aunt at the time the crime was committed.

Harry Mattis, eighteen years old, and William Bryant, seventeen years old, were two of the People's principal witnesses. They testified they had known Hicks for over three years. Hicks went over to Mattis' home in his car

on May 6, between 10:00 and 11:00 A. M. While there Hicks told Mattis that he had a Louisiana license plate on his car. At the time he left the Mattis home policemen were examining the motor of Hicks' car, and Hicks returned and asked to exchange sweaters with Mattis, which was done. Later that day he again saw Hicks in his car in front of the Kimbark Theatre. At Hicks' request Mattis got in the car and drove over to the rear of Hicks' house. The two then went into the house through the second floor rear and into the room occupied by Hicks and his wife. While there Hicks opened one of the dresser drawers and showed Mattis one of his wife's rings and asked Mattis if he wanted to see a gun. Upon an affirmative answer Hicks then pulled the mattress back and showed him three guns. In answer to the question where he got them Hicks said, "Just picked them up." Mattis again saw Hicks at Fifty-sixth street and Dorchester avenue between 6:30 and 7:00 P. M. that same day, when Hicks got out of his car and came over to the Buick car in which Mattis was sitting. On the morning of May 7, before 6:45 A. M., Mattis said he left his home, at 6018 Kimbark avenue, to go to the Marquette Garage, located at Sixty-seventh and State streets, in response to a prior telephone call from McMahon concerning employment; that when he reached Sixty-first and Kimbark avenue he met Bill Bryant, of 6522 Blackstone avenue, who had left home at 5:45 A. M. to assist Irving Rossing on a paper route. Mattis said that he and Bryant walked south on Kimbark from Sixty-first to Sixty-second street, then west on Sixty-second to Woodlawn; that while on Sixty-second street their attention was attracted by a screeching noise of an automobile; that the car turned south into the alley between Woodlawn and Kimbark from Sixty-second street; that there were three men in the car, and the driver thereof was Hicks and the license plates were upside down. Mattis said the two continued to walk, turning south on Wood-

lawn avenue from Sixty-second street, and that when they reached a point between 6221 and 6225 Woodlawn avenue they heard about five shots, but continued on. When Mattis and Bryant had reached a point between 6241 and 6245 Woodlawn avenue they saw a car come out of the alley from the east, going fast, turn south in Woodlawn avenue, run through the stop-light at Sixty-third and Woodlawn and disappear from sight when it crossed Sixty-fourth street. Bryant's story was substantially the same as Mattis' in all detail and their testimony was not varied or changed on cross-examination. They both testified that when the car came out of the alley they were only ten or twelve feet away from it, that in the car were three men, one of whom was Hicks, who was driving, and that the car was a Ford V-8, with its license plates turned upside down.

Ernest Grove, an eighth-grade student, who lived at Sixty-second and Dorchester, which is two blocks east of Kimbark, testified that he was on his way to the Fyffe school to keep an early appointment with his teacher; that while walking on the north side of Sixty-second street he heard shots as he reached Kimbark avenue; that he ran diagonally across the street to the middle of the alley between Woodlawn and Kimbark avenues; that while he was running the shots continued but when he got to the alley they had ceased; that he was looking south from Sixty-second street and saw three men running for a car, get into the car, start it and turn west at the end of the alley toward Woodlawn avenue. He said he saw a milk wagon standing in the alley, but could not positively identify the men who were running and drove away.

The defense was an alibi. Hicks testified in his own behalf that on May 7, 1934, about 7:00 A. M., he was at home; that he was not driving or in a car in the alley between Kimbark and Woodlawn south of Sixty-second street with two other men, and that he did not drive a car

with Louisiana license plates turned upside down. He said he knew Harry Mattis but did not believe he ever saw William Bryant before, although he might have seen him on the street, but he did not remember for sure. He denied that he went to Mattis' home on May 6, 1934, and said he did not take Mattis to his room and show him three revolvers that day. On cross-examination he admitted that he was at Mattis' home once, in April, 1934, and at that time exchanged sweaters, but did not believe it could have been in May. He insisted that on May 6, in the afternoon, he drove the car over to his father's, over to a friend of his wife's and then back home, and said he usually went over to his father's every day.

An aunt of Hicks, Mrs. Andree, testified she saw him in bed about 7:10 A. M. on May 7, 1934, when she brought hot water to him because he vomited the night before, and that his wife was there also. She said he left the house about 8:20 P. M. that day; that on May 6 Hicks and his wife were washing the kitchen walls and ceiling when the witness left for church, about 10:45 A. M., and that they were not quite through when she returned, about 12:45 P. M.; that at 3:15 P. M. Hicks and his wife left to go to his father's, and that they returned about 6:30 P. M., had supper and then went to their room and worked on picture puzzles. She related that on the afternoon of November 14 she learned of his arrest from Mrs. Davis, who lived in. the same building with them, but she did not know when she found out why he was arrested; that when she did find out she began to wonder what he had done on May 7 and talked about it.

The defendant's uncle, Arnold Andree, testified that Hicks had a Ford with Louisiana license plates on it, and that he saw it in front of the house on May 7, about 7:30 A. M. He said he did not learn of Hicks' arrest until three or four days afterwards, when he was so told by a man named Fried. The father of the defendant, Charles G.

Hicks, testified he saw him on May 7, 1934, about 7:45 A. M., at the home of his sister, Mrs. Andree.

We have reviewed all the testimony heard on the trial but deem it unnecessary to relate it in further detail, as much of it had to do with matters concerning the apprehension and arrest of Hicks and other matters of no particular probative value.

After the close of the defendant's case several witnesses were produced by the People in rebuttal. Among these, two police officers and a druggist were called and asked if they knew Hicks and knew his reputation for truth and veracity. Objections were made in behalf of Hicks to these questions but all were overruled. The three witnesses then testified that Hicks' reputation for truth and veracity was bad. It is now claimed that the court erred in admitting this testimony because evidence to impeach his character was not admissible until he opened the door by introducing evidence of his own good character. We have examined these questions and find that they do not transgress the rule insisted upon by counsel for Hicks. No attempt was made by the State's attorney to impeach the character of Hicks. The questions had to do only with his reputation for truth and veracity. While the terms "character" and "reputation" have sometimes been loosely and synonymously used, such use is inaccurate in that it fails to recognize that "character" means what a person really is while "reputation" means what he is supposed or estimated to be. (22 Corpus Juris, p. 470.) Hicks had testified in his own behalf. The law in this State is, that when the accused testifies in his own behalf his credibility then becomes subject to attack and to the same tests as are legally applied to any other witness. (*People* v. *Johnson*, 333 Ill. 469.) The rule seems universal that where a defendant in a criminal action takes the stand in his own behalf he is subject to impeachment and to examination re-

garding matters affecting his credibility. 70 Corpus Juris. p. 793, and cases cited.

The argument of Hicks is principally devoted to claims that the proof was altogether circumstantial, that no motive was shown, and that the verdict and judgment were not supported by any evidence of probative value. It is true that no one saw the homicide committed. It was not, and cannot be, questioned, however, that Cornfield was murdered early in the morning of May 7, 1934, and that Hicks was positively identified by two witnesses immediately after the shooting, as he was driving away from the scene of the crime with two other men. The testimony of the two boys who identified Hicks as the driver of the Ford V-8 car with Louisiana license plates upside down, who saw him enter into the cross-alley from the north and drive out the west entrance of the main alley into Woodlawn avenue at high speed, was not impeached although subjected to rigorous cross-examination and repetition of all its details and directions. The jury heard this testimony, together with the alibi testimony offered by Hicks, and had the advantage, not possessed by us, of seeing the witnesses and observing their demeanor on the witness stand. They chose to believe Mattis and Bryant rather than Hicks and his relatives. Circumstantial evidence which links the accused with the commission of a crime and which is so consistent and direct that it removes all reasonable doubt of the guilt of the defendant is sufficient to warrant a conviction. (*People* v. *Delorenzo,* 300 Ill. 124.) Where a criminal act is established by direct or circumstantial evidence it is not necessary to show motive. *People* v. *Corder,* 306 Ill. 264; *People* v. *Watkins,* 309 id. 318.

Much of the evidence to which objection is now made in the brief and argument of present counsel for Hicks was admitted without objection by counsel who represented him at the trial. This is true of the questions asked the

police officers in rebuttal on the subject of Hicks' credibility. The record shows that evidence of Hicks' arrest on another charge was not objected to when offered. The testimony, on re-direct examination, of a conversation between Lybarger and Marshall is now objected to, but this testimony was brought out on cross-examination by counsel for Hicks, and the only question asked by the State's attorney to clear it up was not objected to. This same thing happened with reference to the testimony by Mattis concerning his visit with Hicks on May 6, when Mattis related the happenings with reference to the guns and the Louisiana license plates. No objection was then made by counsel for Hicks to this testimony nor was any motion made at the conclusion of this testimony to strike it out. The proper defense against improper evidence is an objection at the time it is offered, and where counsel has been employed by defendant he cannot sit silently by and allow incompetent or immaterial evidence to be introduced and later turn that silence into a valid claim for reversible error when by timely objection he might have had the adverse evidence kept out or stricken out. *People* v. *Newman,* 261 Ill. 11, and cases cited.

It is further claimed that Hicks was improperly denied a new trial after presenting five affidavits of newly discovered evidence to the trial court. The record shows that his sole defense at the trial was an alibi, and no effort appears to have been made by his attorney, prior to the trial, to obtain testimony other than from his own relatives. He had approximately three months to get ready for trial and was furnished with a list of the State's witnesses, all of whom could have been interviewed if he had been diligent in that behalf. Among the affidavits presented in support of .the motion for a new trial on newly discovered evidence, it appears that two of the affiants, Agnes Blair and Helen Linchester, were at the coroner's inquest, the former there testifying. Another of the affiants, James Shomo,

was subpœnaed as a State's witness and appeared in court but was not called to testify. These witnesses were all interviewed by counsel for Hicks within a few days after his conviction, and no reason is given to excuse the apparent failure to likewise interview them before the trial. Under these circumstances we do not believe the trial court erred in refusing to grant a new trial, as it clearly appears that this evidence might equally as well have been discovered before trial if due diligence had been exercised. *People* v. *Buzan,* 351 Ill. 610.

After a careful examination of the record we find no error which would afford legal grounds for reversal of the judgment in this case. We appreciate fully the gravity of the offense charged and the importance of seeing to it that the defendant received a fair trial. The record does not enable us to conclude that injustice has been done, nor are circumstances shown which would justify us in substituting our interpretation of the written record to overthrow the verdict and judgment of the twelve jurors and judge, who heard and saw the witnesses. We have uniformly held that if no reversible error of law appears in the record we will not disturb a judgment of conviction where it does not appear that the verdict is palpably contrary to the weight of the evidence or unless the evidence is so unreasonable, improbable or unsatisfactory as to justify a reasonable doubt of the defendant's guilt. (*People* v. *Oliff,* 361 Ill. 237; *People* v. *Wynekoop,* 359 id. 124; *People* v. *Hunter,* 329 id. 186.) The fact that Hicks was poorly represented at the trial and has secured new attorneys to represent him here is of no legal moment, as his original attorney was of his own choosing. *People* v. *Mahoney,* 361 Ill. 202; *People* v. *Hartwell,* 341 id. 155.

The judgment is therefore affirmed.

*Judgment affirmed.*

Mr. JUSTICE SHAW, dissenting.