(No. 34104.—)

THE PEOPLE OF THE STATE OF ILLINOIS, Defendant in Error, *vs.* CAMERON JUDKINS, Plaintiff in Error.

*Opinion filed January 24, 1957—Rehearing denied March 19, 1957.*

FRANK W. OLIVER, of Chicago, for plaintiff in error.

LATHAM CASTLE, Attorney General, of Springfield, and JOHN GUTKNECHT, State's Attorney, of Chicago, (FRED G. LEACH, EDWIN A. STRUGALA, IRWIN D. BLOCH, CHARLES D. SNEWIND, and EDWARD J. FLEMING, of counsel,) for the People.

Mr. JUSTICE SCHAEFER delivered the opinion of the court:

Defendant, Cameron Judkins, was indicted in the criminal court of Cook County for selling heroin in violation of the Uniform Narcotic Drug Act. He pleaded not guilty and waived a jury trial. He was found guilty, and sentenced to the penitentiary for a term of not less than two nor more than five years.

He contends that the prosecution failed to prove either that he sold the substance in question or that the substance was in fact heroin, and that therefore his conviction should be reversed. These contentions make it necessary to analyze the testimony in some detail.

On June 29, 1955, Ocie Motley, a narcotics user, was in police custody. His pockets were searched by officer Hines who then gave him fifteen dollars in bills and recorded the serial numbers. Officers Hines, Ewing and Wright then drove Motley to the corner of Fiftieth Street and St. Lawrence Avenue, stopping on the way to let him make a telephone call. Motley then stood in front of 4949 St. Lawrence, while Hines and Wright stationed themselves in the vestibules of adjacent buildings. Ewing remained in the car. Hines and Ewing testified. Both officers saw a green Dodge pull up to where Motley was standing. Hines saw Motley get into the car and stay "about a minute." Ewing was not able to say whether Motley got into the car because he was "quite a distance away." Neither officer saw what transpired between Motley and the sole occupant of the car. Motley testified that he got into the car, that he asked the defendant for the package he had asked for

on the phone, that he received a small package wrapped in cellophane containing white powder and that he gave the defendant the fifteen dollars which had been given to him by Hines. The defendant testified that Motley merely opened the door of his car, threw money on the seat and ran, and that he did not give Motley anything. He also testified that he came to the rendevouz in response to Motley's phone call because he thought Motley wanted to borrow money from him.

According to both officers when Motley left the defendant's car he walked to Ewing's car. Ewing testified that Motley got into his car and handed him a package and that he gave the package to Hines without marking it in any way. Hines testified that when Motley left the Dodge he went over to it and arrested its sole occupant, the defendant, and that he found the money he had given to Motley on the seat of defendant's car to the right of defendant. Hines further testified that at the time of the arrest Ewing handed him a package, that he did not make any mark on the package, but that after he inventoried it at the detective bureau, he placed it in an envelope on which he wrote his signature and then took the envelope and its contents to Charles Vondrak, a crime laboratory technician.

Vondrak testified that on June 29, 1955, Hines handed him an envelope on which he placed his initials, and that he opened the envelope and found a package therein on which he also placed his initials. He then began chemical tests of the contents. It was this package which was admitted in evidence at the trial. Neither Motley, Hines nor Ewing was able to say that it was the same package that they had handled on June 29, 1955. All that they were able to say was that it looked like the same package. The envelope bearing Hines's signature and Vondrak's initials was identified by both.

Upon this evidence defendant contends that the prosecution failed to prove that the package whose contents were

analyzed by Vondrak was the same package that the defendant allegedly sold to Motley. He argues that it is necessary to use presumptions to establish the fact sought to be proved. In this case, however, the testimony of the witnesses traced the package from the defendant to Motley, from Motley to the arresting officers and ultimately to Vondrak. No presumptions are necessary. Continuity of possession has been fully established.

A rule that required not only that continuity of possession be established, but also that there be positive identification by everyone concerned, would impose an unnecessary burden, while it would not assure a fairer trial to the accused. Continuity of possession is as effective to guarantee identity as are identifying marks or labels. Indeed, since identifying marks may be fabricated at later date, continuity of possession, which requires proof of delivery, presence and safe keeping, is more readily subject to verification. (See cases collected, 21 A.L.R.2d. 1219.) It is true that a vital link in the chain is established by the testimony of Motley, an admitted drug addict. While his addiction has an important bearing on his credibility (*People* v. *Crump,* 5 Ill.2d 251,) the trial court could properly give credence to his testimony, which was corroborated in almost all respects by that of the police officers. (*People* v. *Hamby,* 6 Ill.2d 559; *People* v. *Henry,* 3 Ill.2d 609; compare *People* v. *Gilbreath,* 1 Ill.2d 306.) We hold, therefore, that the identity of the package admitted in evidence was properly established.

Defendant's other main contention is that the prosecution failed to prove that the substance analyzed by Vondrak was in fact heroin. Vondrak's testimony was that he applied the Marquis, Zernick and Oliver tests to the contents, and from these tests concluded that the substance was heroin. No objection is made as to Vondrak's ability to apply the tests. His uncontradicted testimony showed that he had applied them in 2000 to 3000 narcotics cases. De-

fendant's contention is that Vondrak's lack of qualification as an expert is shown by his inability to answer certain questions on cross-examination.

Much is made of the fact that he was unable to remember on the witness stand the exact structural arrangement of the elements that make up the heroin molecule, but we are not impressed. The qualifications of a lawyer could hardly be measured by his ability to recite *verbatim* the Statute of Frauds. Similarly the witness was not able to say what aspect of the diacetyl morphine hydrochloride (heroin) molecule reacted to each of the different reagents used in the three tests. There is, however, neither proof nor suggestion that there is agreement among chemists as to that subject.

Similarly, it is suggested that there may be derivatives of morphine that are isomeric to heroin,—that is, derivatives made up of the same elements united in the same proportion by weight, but differing in their structural arrangement. But the record does not show that there are such isomers of heroin, that if such isomers exist they are to be found outside the experimental laboratories, or even that they bear any resemblance to heroin in physical appearance. No effort was made on cross-examination to show that the recognized tests (see Bamford, Poisons, their Isolation and Identification, 3d ed. 1951, pp. 254-255; Gradwohl, Clinical Laboratory Methods and Diagnosis, 5th ed. 1956, pp. 2322-2323,) that were here employed were not adequate to show that the substance examined was heroin.

The judgment of the criminal court of Cook County is affirmed.

*Judgment affirmed.*