People of the State of Illinois, Plaintiff-Appellee, v. Ronald Belousek (Impleaded), Defendant-Appellant.

Gen. No. 52,356.

First District, Third Division.

June 5, 1969.

Rehearing denied June 27, 1969.

Bellows, Bellows & Magidson, of Chicago, for appellant.

Edward V. Hanrahan, State's Attorney of Cook County, of Chicago (Elmer C. Kissane and James J. Meehan, Assistant State's Attorneys, of counsel), for appellee.

MR. JUSTICE DEMPSEY delivered the opinion of the court.

Ronald Belousek and Arthur Ellis were indicted for attempted burglary, possession of burglary tools and unlawful use of weapons. Tried jointly before a jury, they were found guilty and sentenced to the penitentiary for a term of one to five years on each count. Belousek prosecutes this appeal. He contends that he was not proved guilty beyond a reasonable doubt and that his conviction was based on illegally seized evidence.

On August 28, 1964, between 8:45 and 9:00 p. m., an Evanston, Illinois police officer, Jerome Colleran, while driving a squad car west on Davis Street observed a white over green 1956 Chevrolet occupied by two men driving west on the same street.

Davis Street is a four-lane, one-way thoroughfare. The police officer was in the first lane of traffic north of the south curbline; the Chevrolet was in the first lane of traffic south of the north curbline. The Chevrolet was stopped for a red light at Benson Street when the officer's car approached about 25 feet to the left. It was dark outside and the officer noticed that the Chevrolet had neither headlights nor taillights on.

As soon as the light changed to green, the Chevrolet turned north onto Benson Street. Because he was in the wrong lane, Colleran could not follow it so he drove to the next street, turned north one block to Church Street and then turned east to Benson. As he arrived at the intersection of Benson and Church Streets he saw the Chevrolet emerge westbound from an alley between Davis and Church Streets. The auto made a right turn into Benson and stopped for the red light at Benson and Church. The auto's lights were still off. Colleran, who

443

up to this point had had the red light, observed a portion of the auto's 1964 Illinois license plate number, LB 26. As Colleran's stop light turned to green he drove east on Church Street and then circled around in an attempt to get behind the Chevrolet. However, when he returned to the intersection of Benson and Church the Chevrolet had disappeared. He advised his police station and the other cars in the area by radio that he had seen a 1956 Chevrolet, white over green, with two white males in the front seat driving in downtown Evanston without its lights on. He asked other cars in the area to look for it. The time of his call was between 8:50 and 9:00 p. m.

About 10 to 15 minutes after making the call, Colleran received a radio message about an attempted burglary by two men in a light car with a dark bottom in the 900 block of Greenwood Avenue in Evanston. The Greenwood location was about six blocks south of the intersection where he last saw the Chevrolet proceeding north on Benson Street. He immediately radioed his fellow officers to look for the car he had previously described—that it might be the one involved in the attempted burglary.

Colleran's two calls and the burglary message were heard by Officers Lillig and Branstrom who were driving in a squad car on Sherman Avenue, approaching Dempster Street. A minute or two after Colleran's second call Branstrom spotted a 1956 Chevrolet with a white top and a green bottom with two white males in it driving east on Dempster Street about three blocks from the 900 block of Greenwood. The car's lights were on.

The officers stopped the auto and got out of the squad car. Branstrom spoke to the driver, Belousek, and Lillig approached the other side of the auto and the passenger, Ellis. Ellis was wearing dark pants and a dark coat; Belousek was wearing a suit of a dark shade. Branstrom ordered Belousek to leave the auto. Belousek

obeyed and to the ensuing questions responded that he had been trying to locate a girl's apartment near Dempster Street in Evanston. He denied being on Davis Street or driving without his lights. Belousek displayed a chauffeur's license which had expired a few days earlier. Meanwhile, Lillig directed Ellis to open the door and questioned him about his name and address. Ellis said that his name was "Arthur Popolusis, or something like that," but did not have any identification. While questioning him, Lillig saw a tire iron protruding from under the front seat. He pulled out the iron and in doing so observed a blackjack which was under the seat next to it. He questioned Ellis about the two objects, but Ellis protested that he knew nothing about them—that he did not even know they were there. Lillig also questioned Ellis about the auto. Ellis responded that it was not his and that he did not know to whom it belonged. Lillig later asked Belousek about the objects and the auto. His answers were the same as those of Ellis except that he said that he had borrowed the auto that evening from a friend whom he had known about six months.

As the officers were questioning the two men, Colleran drove up. The stopped auto was the same one he had previously seen and the two men were the persons he had seen in it. Belousek and Ellis were arrested.

About 9:00 p. m. on the same night, Mrs. George Seaverns looked out the window of her second-floor apartment at 902 Greenwood Avenue in Evanston and saw two men alight from a car parked on the street below. The men, one of whom was wearing a dark suit, walked along the parkway looking up at Mrs. Seaverns' building. A few minutes later she walked into her kitchen which was unlighted. While standing there she heard the sound of scrunching wood. She called out, "Gladys," to see if her neighbor who lived alone needed help. A minute passed, then Mrs. Seaverns heard the noise again. She called, "Gladys, can I help you? Is that you?" but still

there was no answer. The only sound was of footsteps going down the stairs. Mrs. Seaverns unlocked her back door and went out on an enclosed porch which she shared with her neighbor, Gladys Blair. The light on the back porch was out because the bulb had been unscrewed but it came on when Mrs. Seaverns tightened it. With the light, she examined her neighbor's door and saw fresh marks on it. She returned to her apartment and again looked out the window. She saw the two men whom she had seen before walk to a Chevrolet sedan with a white top and a green bottom. They were not carrying anything and the car which they entered pulled away from the curb at a normal speed. Mrs. Seaverns went to the telephone and called the police. Later that evening, Mrs. Blair returned home. She said she had locked her back door before leaving and that it was undamaged at that time.

The tire iron and blackjack, together with the doorjamb from Mrs. Blair's back door, were taken to the crime laboratory of the Chicago Police Department and turned over to the officer at the front desk. The next morning Albert Forslev, a mineralogist and geochemist employed by the crime laboratory, found the items locked in his laboratory.

Forslev examined the tire iron and the doorjamb in accordance with the instructions he received. On the wooden jamb was an impression semicircular in shape that measured two centimeters in diameter. A comparable measurement on the tire iron was the same. Other damaged areas on the jamb did not correspond to the measurements of the tire iron. He then examined the spoon-shaped end of the tire iron under the microscope and observed paint fragments adhering to the metal surface—individual particles about a millimeter in diameter which consisted of a cream colored layer over a white, over a bluish gray layer. Next, he made a microscopic examina-

tion of samples of paint taken from the damaged portion of the wood near the semicircular impression. He found the three-layer paint again, similar in color, thickness and sequence of layers to the paint on the tire iron. The sequence of the layers, however, was reversed as would result from a metal object being pressed against a painted surface. He further performed chemical tests of the paint particles on the block of wood and the tire iron. The paint from the one object gave the same chemical reaction as that from the other. On the basis of his examination it was Forslev's opinion that the particles of paint had a common origin.

Belousek first contends that he was not proved guilty beyond a reasonable doubt—that the circumstantial evidence upon which his conviction was based did not exclude every reasonable hypothesis except that of his guilt. ■ A conviction can be sustained upon circumstantial evidence as well as upon direct evidence. People v. Asey, 85 Ill App2d 210, 229 NE2d 368 (1967). A conviction based upon circumstantial evidence will be upheld if the evidence is of such a convincing nature that it satisfies the jury of the defendant's guilt beyond a reasonable doubt. People v. Colby, 27 Ill2d 273, 189 NE2d 317 (1963); People v. Robinson, 14 Ill2d 325, 153 NE2d 65 (1958). In this case the quality of the evidence was sufficient to meet this standard.

The paint on the tire iron was similar in color, thickness and sequence of layers and had the same chemical makeup as the paint on the doorjamb. The defendant attempts to explain this away by suggesting that the paint could have come from any back door of the 18-apartment building and that the tire iron and doorjamb might have come into contact with each other while in the possession of the Chicago Police Department, since there was no accounting for control of the items between the late afternoon of the day they were delivered to the

crime laboratory and the following morning when Forslev found them in his laboratory. The first explanation is speculative, the second without merit. The tire iron and doorjamb were wrapped separately in paper bags when delivered to the crime laboratory. They were still individually wrapped when Forslev came upon them locked up in his laboratory. All of this indicates careful handling of the items to preserve their original condition and insure the integrity of the tests. Nothing in the record suggests tampering, alteration or substitution, either intentional or accidental, with the separately wrapped items during this period. Cf. People v. Anthony, 28 Ill2d 65, 190 NE2d 837 (1936). Under these circumstances the failure to show who carried the items from the receiving desk of the crime laboratory to Forslev's laboratory is not a fatal defect in the chain of possession.

The fact that one indentation on the damaged portion of the doorjamb corresponded with one part of the tire iron is added proof of the defendant's guilt. The defendant retorts that other crunched areas of the jamb were not comparable in measurement to anything measured on the tire iron but this does not mean that the iron could not have caused them.

██ The defendant was arrested 10 to 15 minutes after the attempted burglary and only three blocks from the scene. He was driving a Chevrolet with a white top and a green bottom, had a male passenger and he and his companion were wearing dark suits—facts which matched the men and the car seen by Mrs. Seaverns. All of this evidence linked the defendant to the crime and supported the jury's verdict.

The defendant's other contention is that the search of his auto violated the 14th Amendment of the United States Constitution and article II, section 6, of the Illinois Constitution. He argues that the search was unreasonable and based upon a vague suspicion that the car

driven by him was the one seen without its lights and the one involved in the attempted burglary.

■ Officer Lillig testified that the items seized came into his view without a search. He saw the tire iron protruding from under the front seat as he was questioning Ellis, and he saw the blackjack as he reached down to pull the iron out. Observation of that which is open to view does not constitute a search and the seizure of articles in plain view is not unreasonable. People v. Pickett, 39 Ill2d 88, 233 NE2d 560 (1968) ; People v. Tate, 38 Ill2d 184, 230 NE2d 697 (1967).

■ Even if the seizure of the items resulted from a search, the search was based upon probable cause. Within a short period of time the arresting officers had heard three broadcasts which described an auto involved in a traffic violation and one involved in a criminal offense. The descriptions of the autos and their occupants were similar. Within a minute or two after the last message they saw an auto that corresponded exactly with those described and it was occupied by two white men. This, plus the proximity in time and the nearness in location to the two offenses, gave the officers sound reason to think that the auto they saw was the one involved in the offenses. The fact that the auto seen by Colleran was traveling away from the place of the burglary attempt, and that the stopped auto had its lights on does not detract from the reasonableness of their action in detaining its occupants and searching their vehicle. The officers knew that a minor and a major offense had been committed and they had reasonable grounds to believe that the occupants of the auto committed both of them. They had no time to gather more information about either the traffic violation or the attempted burglary. They had to act quickly or the auto and its occupants would have been gone. With the information they had it was their duty to investigate the suspected car. People v. Buck, 92 Ill App2d 16, 235 NE2d 837 (1968).

449

Once the car was stopped, Lillig obtained a further ground for investigation: the passenger, Ellis, had no identification. Cf. People v. Carter, 38 Ill2d 496, 232 NE2d 692 (1967) ; People v. Jordan, 87 Ill App2d 338, 231 NE2d 630 (1967).

The judgment is affirmed.

Affirmed.

SULLIVAN, P. J. and SCHWARTZ, J., concur.