THE PEOPLE OF THE STATE OF ILLINOIS, Plaintiff-Appellee, *v.* JOHN ALFRED HINES, Defendant-Appellant.

(No. 69-31;

Third District—March 9, 1971.

John Alfred Hines, *pro se;* Edwin E. Mortell, Jr., of Kankakee, for appellant.

Edward P. Drolet, State's Attorney, of Kankakee, for the People.

Mr. PRESIDING JUSTICE ALLOY delivered the opinion of the court:

Defendant John Alfred Hines appeals from a conviction for attempted murder, armed robbery, and aggravated battery following a jury trial. Defendant was sentenced to from 15 to 25 years in the penitentiary.

The record in the case discloses that Edward Saltzgiver was working alone on the evening of July 1, 1968, in a Clark service station in Kankakee. He stated that about 1:30 A.M. on July 2, he saw the defendant Hines come over a fence north of the station and that defendant called to him by name. Saltzgiver stated that he had known the defendant since they were in the fourth or fifth grade. After defendant went into the restroom at the station, Saltzgiver unlocked the station door and let defendant in. Saltzgiver then testified that defendant drew a pistol and asked Saltzgiver how much money he had on him. The witness stated that the defendant took all the money Saltzgiver had on his person and when he demanded more money, Saltzgiver testified that he gave the defendant his money changer. Saltzgiver then also testified that defendant told him that he would have to come up with more money for his life and he backed Saltzgiver against the wall and began firing a pistol. Saltzgiver was struck five times, three bullets struck him in the head, one in the shoulder, and one in the hand. Saltzgiver got to his feet after the shooting and got a pistol from a drawer and went outside looking for defendant but could not find him. Saltzgiver then called the police. He gave the police a description of the man who shot and robbed him but did not give the name of the defendant at that time. He was in the hospital six days and while he was there an officer talked to him about the robbery. Two or three times prior to July 11, Saltzgiver denied to the police that defendant was the man who shot and robbed him. On July 11, Saltzgiver told a friend, Bob Yactzac, who runs the Bradley Cab Company, that it was John Hines who shot and robbed him. Yactzac then went to the Bradley police and told them that Saltzgiver had revealed to him the name of the man who shot and robbed him on July 2.

Thereafter, the police, acting on information which Saltzgiver relayed to the police, obtained a warrant for the arrest of Hines on July 11. The

police learned that defendant was staying at either 707 Francine Street or 293 N. Greenwood Street in Kankakee. An arrest team was sent to each location. An officer entered the house at 707 Francine and found defendant asleep in a bedroom. The officer arrested him. Defendant was then taken outside to the patrol car and Sergeant Reynolds, who had gone to the Greenwood location, was told of the arrest by radio. When Sergeant Reynolds arrived at 707 Francine and saw the defendant in the patrol car he got out of the car and took the defendant back into the house. Defendant had only been in the patrol car a short time. Sergeant Reynolds, upon entering the house, continued the search of defendant's room. Defendant and his father, who owned the house, objected to the search. Sergeant Reynolds testified at the trial that prior to the arrest he had a description of the weapon which was used in the robbery, which was a .22 revolver with a 2″ barrel of black steel with white grips. Sergeant Reynolds searched the bedroom while defendant was standing in the hallway, and, in a dresser drawer wrapped in clothing, the sergeant found a .22 revolver with a 2″ barrel of black steel with white grips. He then brought the gun out and showed it to another patrolman and to the defendant and defendant's father and gave defendant's father a receipt for the gun.

The gun was admitted in evidence at the trial. At the trial, Lieutenant Rogers of the Kankakee police department testified that he investigated the robbery at the Clark station on the morning of July 2. He stated that he found two spent bullets in the northeast corner of the building. He wrapped them and put them in an envelope and they were admitted into evidence as an exhibit. Dr. Downie, who treated Saltzigiver at the hospital on the morning of July 2, testified that he removed pieces of metal from Saltzgiver in the operating room and that the metal pieces were passed to the nurses who placed them in a bottle and sent them to the pathology laboratory. The metal fragments taken from Saltzgiver were offered as an exhibit. The doctor stated he could not stop to mark them during surgery and, thus, could not say for sure that they were the same fragments which he removed. He stated that he did not know the names of the nurses who were working with him in surgery on the morning of July 2 when he treated Saltzgiver.

During the course of the trial, the State called three witnesses to trace possession of the metal fragments removed from Saltzgiver on the morning of July 2. The witnesses were a nurse, a laboratory technician and a doctor who is pathologist at St. Mary's Hospital. Defendant had requested a list of witnesses prior to trial and none of the three witnesses were listed. When the State attempted to call these three witnesses, the trial had already been in progress for three days. The State's Attorney explained to the court that the doctor did not know the names of the nurses and

that is why they had not been included. The court admonished the State's Attorney to be more careful in the future and he then permitted the defendant's attorney to talk with the three witnesses during the noon hour and admitted the testimony of these witnesses. The pathologist testified that the metal pieces were given to him by the laboratory technician and that they were in the same container in the court as when he got them. He turned the exhibit over to Officer Chaney. The nurse stated she was in the emergency room when the doctor was working on Saltzgiver and took the metal fragments which were removed from Saltzgiver, placed them in a plastic bottle, and marked the bottle with Saltzgiver's name and room number. The laboratory technician testified that the fragments were picked up from surgery and taken to the pathologist. A police officer stated that he picked up the fragments from the pathologist and gave them to Lieutenant Rogers.

Mr. McAlvey of the Illinois Bureau of Criminal Investigation testified as a ballistics expert. He had examined the gun, the spent bullets found at the Clark station and the metal fragments removed from Saltzgiver. He also identified as an exhibit test bullets which he fired from the gun. He stated that his examination and test showed the same markings on all the various bullets. He testified that although one of the bullets in the fragmented stage was too mutilated to examine, the other fragments checked out as to markings. The trial judge questioned Mr. McAlvey about identification of the bullets. McAlvey explained that each gun barrel marks a bullet in a manner which can be specifically identified as having come from a particular gun barrel and that the markings were such that there were no two alike and that the process of identification is similar to that used in connection with fingerprints. McAlvey testified as to the custody of the exhibits since they were delivered to him and as to markings he made on the various fragments to identify them in court.

Defendant Hines testified that he went to a tavern about 11:00 P.M. on the evening of July 1 and stayed there until around 2:00 A.M. the next morning when the tavern was ready to close. His aunt, a cousin, and his brother were with him. He stated he was drunk that evening and his aunt put him in a taxicab about 2:00 A.M. and he went to 293 Greenwood and went to bed. He testified that he did not go to the Clark station and did not rob Saltzgiver and also that he did not own the pistol which was in evidence in the case. Defendant's aunt testified she was with defendant from midnight until 2:00 A.M. and that she took defendant who was intoxicated and put him in a cab about ten minutes before 2:00 on the morning of July 2. The cousin of defendant, Mr. Boles, stated he was with defendant and his mother (the aunt of defendant) until about 1:30 A.M. when he left with his girl. The cousin stated he was sometimes mis-

taken for defendant. Defendant's brother also testified that he had sometimes been mistaken for defendant and that he was with defendant at the tavern. When defendant's brother was asked about the gun, he refused to answer on ground of possible self-incrimination.

Bob Yactzac testified that he knew defendant and had picked him up in his cab in Kankakee about 10 minutes before 1:00 A.M. on July 2 and took him to 293 Greenwood. He stated that this was from memory as he did not keep written records at this time. He also stated he had 75 to 125 calls a day. The jury found defendant guilty and defendant's post-trial motion for a new trial was denied.

■■ On appeal in this Court, defendant contends that he was not proven guilty beyond a reasonable doubt. The record discloses that defendant was positively identified by Saltzgiver who stated he had known defendant since the fourth or fifth grade. Saltzgiver had the opportunity to see the defendant at close range in the station when he was fired upon six times (with five of the shots striking him). The circumstance that Saltzgiver failed to tell anyone that it was defendant who robbed him until nearly nine days later and even denied that defendant was the attacker, affects the weight to be given to Saltzgiver's testimony. We do not believe, however, that this case is of the character of *People v. Roe*, 63 Ill.App.2d 452, where a victim waited 16 days to give the name of an assailant. In that case, the victim had just met the assailant for the first time at a party the night before he was attacked. In the case before us, Salzgiver had known defendant for years. In the *Roe* case there was no other evidence to link the defendant with the crime while, in the instant case, the gun found in defendant's room is strong circumstantial evidence supporting a finding of guilt of the defendant. The alibi evidence of defendant consisted of his own testimony and that of his aunt and his cousin. His cousin left with his girl friend around 1:30 A.M. which was about the time of the robbery so that the only alibi testimony remaining consists of the testimony of the defendant and his aunt. In contrast to such testimony, the record discloses the testimony of the cab driver that he picked the defendant up shortly before 1:00 A.M. on the morning of July 2. Even though the cab driver was a friend of Saltzgiver, it cast doubt upon defendant's alibi testimony. Alibi evidence even though not specifically contradicted, need not be believed by a jury (*People v. Johnson*, 123 Ill.App.2d 69). Since both Saltzgiver and Yactzac contradict the alibi testimony, and the evidence on this issue is in conflict, the jury had the right to decide which story to believe. In consideration of the evidence, therefore, we do not believe we would be justified in reversing on the ground that the defendant was not proven guilty beyond a reasonable doubt.

The next issue for consideration is whether the trial judge erred in

allowing three witnesses to testify, whose names were not on the list of witnesses furnished defendant prior to trial. As we have indicated, the testimony of the pathologist, the laboratory technician in the pathology department, and the nurse in the emergency room was heard at the trial. None of the three witnesses were listed on the witness list first furnished defendant prior to trial. The State indicated that it had not learned of such testimony and the names of such witnesses until the trial was actually in progress. The testimony of the witnesses was required to follow the possession of the fragments of the bullets removed from Saltzgiver which were introduced in evidence. The defendant's attorney argued that he was surprised by such witnesses and he did not have time to interview them.

■■■ The question of whether to admit testimony of a witness whose name does not appear on the witness list furnished to defendant, rests within the discretion of the trial judge, but such discretion should not be abused (*People v. La Coco*, 406 Ill. 303). Also in situations such as we are considering in the present case, defendant must show surprise or prejudice through the allowance of such testimony. In some cases in this State the courts have held that a defendant must ask for a continuance if he feels he needs more time to properly interview the unlisted witnesses (*People v. Quevreaux*, 407 Ill. 176). In the case before us, we do not believe that defendant has sustained the burden of showing surprise or prejudice. Defendant knew a ballistics expert was going to testify as to the markings on the bullets involved in the case, since his name was furnished to the defendant. During the trial and prior to the testimony of the three unlisted witnesses, defendant's attorney questioned the doctor who treated Saltzgiver about possession of the bullets removed from Saltzgiver. The testimony of the three witnesses, although important in the case, was relatively simple and merely detailed what they did when they had possession of the bullets. Defendant's attorney was given an opportunity during the noon hour to talk with the three witnesses prior to their testimony. Defendant's attorney did not contend that this was insufficient time nor did he move for a continuance to allow him to have more time to talk to the three witnesses, and, thus, it was apparent he was not prejudiced by the allowance of such testimony (*People v. Bond*, 99 Ill.App.2d 45).

■■ Defendant also contends that the trial judge erred in admitting into evidence the gun found in defendant's room the night of the arrest, the spent bullets found at the Clark station the night of the robbery, and the bullet fragments removed from Saltzgiver by the doctor. A reading of the record discloses that the gun went from the police officer who found it to Susan Kohmar, who testified, and then to Mr. McAlvey who brought it into the court. The fact that the gun was kept in an evidence locker where Kohmar, McAlvey and a third person, who did not testify, had

access, does not affect the admissibility of the exhibit in evidence. There was nothing in the record to indicate any tampering, substitution, or alteration of the object. The fact that some other person might have had access to it and even handled it does not prevent its admissibility (*People v. Belousek*, 110 Ill.App.2d 442, 448). The bullets found at the Clark station were traced from the officer who found them to McAlvey who brought them into the court. The fact that the officer who found them did not make a mark on the fragments to positively identify them later does not affect the admissibility of the exhibit as possession of the bullets was clearly traced by the evidence.

■■ As to the fragments of the bullets removed from Saltzgiver, defendant cites *People v. Berkman*, 307 Ill. 492, as authority for stating that such fragments should not have been admitted. In the *Berkman* case, a doctor removed a bullet from a man and gave it to a nurse whose name he did not know. Later, a nurse whose name was unknown and who did not testify at the trial, went into the man's room and handed him a bullet saying it was the one removed from his back. Under such circumstances, the court refused to allow the bullet to be admitted in evidence. This was not the situation in the case before us where the bullet fragments from Saltzgiver were traced from the doctor to the nurse to the laboratory technician and to the pathologist and then to the police officer and, finally, to Mr. McAlvey who brought them into court. The chain of possession was complete and the fact that certain other people had access to the exhibits at various stages of the possession would not affect the admissibility of the exhibit unless there was actual evidence of tampering or substitution.

During the course of the trial the judge asked questions of several witnesses and, in paticular, he asked the ballistics expert some questions about gun barrel markings on a bullet. His questions elicited the fact that bullets are marked by a barrel in a distinctive manner and that a parallel method of identification would be through fingerprints which are also distinctive. The judge also asked for clarification as to procedure used by the doctor when he did not mark the metal fragments removed from Saltzgiver.

■■■ A trial judge may ask questions to clarify points raised during a trial (*People v. Everett*, 117 Ill.App.2d 411). The questioning and conduct of the trial judge in the cause before us was not improper in any manner. Defendant cites *People v. Moriarity*, 33 Ill.2d 606, where a trial judge emphasized identification of the defendant by witnesses and even interrupted a witness to ask if she knew the penalty for lying. Nothing of this type occurred in the cause before us and there is nothing in the questioning by the trial judge which could constitute reversible error.

■■ The significant question raised on appeal, relates to the denial of the motion to suppress the gun's admission into evidence by defendant. The contention is that the search which resulted in the discovery of the gun was an illegal search. As indicated by the record, defendant was arrested in his room by police officers who did not have a search warrant. Immediately after the arrest, while defendant was still in his room, a brief search of the room and some of the drawers was made by the arresting officers. Defendant was then taken outside to the patrol car and when Sergeant Reynolds arrived a short time later, defendant was taken back into the house, and, after he indicated which room was his, he stood out in the hall while the room was searched and the .22 pistol was found. It is argued that under the case of *Preston v. United States,* 376 U.S. 364, a search contemporaneous with an arrest can be made to seize weapons that an arrested party might use or to prevent the arrested party from destroying evidence of the crime. The court in the *Preston* case indicated that justifications of this type are absent where search is remote in time or place from the place of arrest. Thus, the test referred to in such case is whether the search without a search warrant made at the time of arrest is reasonable as a part of the actual arrest or is unreasonable as being remote in time or place from the arrest. Defendant cites *Chimel v. California,* 395 U.S. 752, decided June 23, 1969. The *Chimel* case restricted the authority of arresting officers in making a search at the time of arrest. The Supreme Court in that case said that officers could search the person arrested and also search the area into which the person might reasonably reach to obtain a weapon or destroy evidence. In substance, the decision permits a search without a warrant only within the area in the immediate control of the arrested person. The question in the cause before us is whether the search which was made when the pistol was found in the dresser drawer of defendant's room was unreasonable as being too remote in time or place with relation to the arrest. Certainly the search was not too remote from standpoint of place even under the precedent in the *Chimel* case, since the gun was in a dresser drawer in defendant's room and, thus, defendant had easy access to it and it was proper to search such area.

The only question is whether such search was too remote in time under the facts in this case. Defendant was taken out of his room to the patrol car and then brought back into the house where he stood in the hall when the search was made. In *People v. Johnson,* 45 Ill.2d 283, 259 N.E.2d 57, it is noted, the Illinois Supreme Court held that in Illinois the *Chimel* case would not be applied retroactively. In the *Johnson* case, an arrest was made and, while defendant was detained, other rooms in his apartment were searched. The court specifically stated that the *Chimel* case should

not be applied retroactively and the only issue was the reasonableness of the search. In *People v. Gardner*, 109 Ill.App.2d 81, it was held proper to search a chest of drawers in a room in which defendant was arrested. In *Stoner v. California*, 376 U.S. 483, where a search was made two days before the arrest in another city, it was held unreasonable as being too remote in time and place. In the cause before us, only a few minutes elapsed while defendant was in the patrol car outside of his home, when he was returned and the search was continued. In several Illinois cases it has been held that if a defendant is arrested outside but immediately adjacent to a dwelling area, the premises could still be searched. (*People v. McGowan*, 415 Ill. 375; *People v. Boozer*, 12 Ill.2d 184). While we realize that this rule, which was consistent with *United States v. Rabinowitz*, 339 U.S. 56, was presumably overruled in the *Chimel* case, it would still apply to the pre-*Chimel* cases arising in this State, such as in the cause before us. The search in the instant case took place on July 11, 1968, before the applicable date of the *Chimel* case. Under the facts in this case and the Illinois Supreme Court decisions, therefore, we must conclude that the search was not too remote in time from the original arrest.

On the basis of the record, therefore, we must conclude that there is no reversible error and the judgment of the Circuit Court of Kankakee County should be affirmed.

Judgment affirmed.

STOUDER and SCOTT, JJ., concur.