THE PEOPLE OF THE STATE OF ILLINOIS, Plaintiff-Appellee, *vs.* ELVIN APPLETON *et al.*, Defendants-Appellants.

(No. 69-78; ▮▮▮▮▮▮▮▮▮

Fifth District—August 11, 1971.

Morton Zwick, Director of Defender Project, of Chicago, (Matthew J. Moran, of counsel,) appellants.

Robert H. Rice, State's Attorney, of Belleville, (William B. Starnes, Assistant State's Attorney, of counsel,) for the People.

Mr. JUSTICE JONES delivered the opinion of the court:

On September 8, 1968 Grady and Elvin Appleton were arrested in St. Clair County, Illinois and subsequently indicted on two counts of armed robbery. They were found guilty at a jury trial and Grady Appleton was subsequently sentenced to serve a term of not less than ten nor more than twenty years, and Elvin Appleton not less than eight nor more than twenty years, in the Illinois State Penitentiary.

The evidence was that at approximately 9:30 A.M. on September 8, 1968, two women were walking on Thirteenth Street in East St. Louis on their way to a bus stop. A car, identified by one of the women as a blue car with a black vinyl top, and perhaps a 1967 Pontiac Catalina, pulled over to where they were walking. The driver of the car demanded their money. The women kept walking but stopped when a gunshot was fired. The driver of the car then came over to them with a gun in his hand and took both women's purses containing a total of $23. During this time a second man remained seated in the car on the passenger side of the front seat. Neither of the women were ever able to get a good look at the second man but they described him as a male Negro. The driver was also described as a male Negro, clean-shaven and wearing dark pants and an orange pullover sweater. During the course of the alleged robbery a second shot was said to have been fired into the grassy area between the curb and the sidewalk. At the conclusion of the incident the two men sped off in the car. One of the women attempted to get the

license number of the car but discovered there were no plates on the car. The police were called. Detective Henderson arrived at the scene, elicited the pertinent information and relayed it to headquarters. In a search of the scene he found a .45 caliber shell casing which he put in his pocket but placed no identifying mark on it.

Two police officers received the radio dispatch concerning the robbery while they were cruising in their police car. A short time later they observed a car fitting the description they had received, although it was a Buick. As they were making a U-turn to stop the Buick for investigation it sped off and the officers gave chase, using their red light and siren. In attempting to elude the police the Buick traveled at speeds up to seventy miles per hour and ran through at least five stop signs. Eventually the Buick was stopped and its two passengers ran in opposite directions. One of the officers chased the man who left the Buick on the driver's side. He caught him and upon searching him found a .22 caliber pistol. This man was identified as Grady Appleton. The other officer was unable to catch the second occupant of the car. On their way to the police station with Grady Appleton the other officer saw the man he had been chasing. He again gave chase and this time was able to apprehend the subject. When arrested, this man was wearing an orange sweater and light-colored trousers and was identified as Elvin Appleton. When he was apprehended he had a .45 caliber pistol in his hand.

At a lineup at the police station later in the day neither of the two women who were the victims of the crime were able to identify the defendants as being the two men who had robbed them. Likewise during the trial neither woman could identify the two defendants as being the men who had robbed them. Defendant Elvin Appleton testified in his own behalf and denied that he and his brother (Grady) had committed the crime. He stated that he had been drinking with some friends in the early morning hours on the day in question and one of his companions had loaned him his car to go home. This was the 1965 Buick with the blue vinyl top. The owner of the car had previously testified to his ownership and confirmed the defendant's testimony as to his whereabouts in those early morning hours, but his testimony was unclear as to whether he had allowed Elvin to borrow his car or whether Elvin had taken it without his permission. Elvin further testified that he drove the car to Grady's home arriving at approximately 8:00 A.M. At home were Grady, his wife, Emma, and a cousin Luella Mims. They began drinking beer but soon ran out. Because they had no money the defendants decided to pawn their guns with another brother and use the money to buy more beer. They left at approximately 10:30 A.M. in the blue Buick. It was while the defendants were driving to pawn the guns

that they were seen by the cruising officers and the reason they fled was because they feared they would get into a great deal of trouble if they were stopped by the police in a car without license plates and carrying two guns. Elvin also stated that on the day of the alleged robbery he was not clean-shaven but had a mustache, which he still wore at the trial, and that he was wearing a red shirt on the day of the alleged robbery, not an orange one. The time of defendants' departure was confirmed by the testimony of Emma Appleton and Luella Mims. However, upon cross-examination the People introduced a statement signed by Luella Mims that she had seen the police chasing the defendant at approximately 9:30 A.M. on the morning in question. In rebuttal of Elvin's testimony, the People produced a woman who worked as a maid in a motel in East St. Louis who testified that at 9:00 A.M. on the morning in question she saw a man whom she identified as Elvin Appleton, at the motel. She saw him at the office with a .45 caliber gun in his hand.

Defendants' first contention is that reversible error was committed when a witness called by the prosecution gave testimony that one of the defendants, Elvin Appleton, participated in a crime other than that for which he was on trial, and that the error was aggravated when the prosecution commented thereon during his closing argument. The testimony to which defendants have reference is that of the woman who worked as a maid in a motel. She was called in rebuttal at the close of defendants' evidence and testified that she saw Elvin Appleton at 9:00 A.M. on the morning of the robbery at the office of the motel with a .45 caliber gun in his hand. Since the crime in question occurred at approximately 9:30 A.M. his testimony constituted an alibi and the motel maid was called by the People for the twofold purpose of refuting the alibi and attacking the credibility of the defendant. It is the State's position, with which we must agree, that since the defendant Elvin Appleton, had elected to take the stand and testify in his own behalf he thereby placed his credibility in issue and subjected it to attack and to the same tests as are legally applied to any other witness. (*People v. Miller*, 13 Ill.2d 84, 148 N.E.2d 455; *People v. Hicks*, 362 Ill. 238, 199 N.E. 368; *People v. Johnson*, 333 Ill. 469, 165 N.E. 235.) Accordingly, defendants are in no position to complain since it was their evidence that invited the rebuttal testimony by the motel maid to refute the evidence of alibi. That such testimony would show or infer that defendant had committed another offense would not render it inadmissible. *People v. Bartz*, 342 Ill. 56, 173 N.E. 779; *People v. Pargone*, 327 Ill. 463, 158 N.E. 716; *People v. Hanley*, 317 Ill. 39, 147 N.E. 400; *People v. April*, 97 Ill.App.2d 1, 239 N.E.2d 285.) Defendants argue that there was no need to present any rebuttal evidence to link Elvin Appleton and the .45 caliber gun

which he possessed when he was arrested since he had admitted it was his gun. The fact that the witness remembered that Elvin Appleton held a gun during his appearance at the motel office would serve to show that the witness would have some reason to recall the particular incident which occurred approximately four months previous to her testimony. In any event, our reading of the transcript of the testimony of the maid discloses that her testimony did not implicate defendant Elvin Appleton in any other crime, including armed robbery, as suggested. Her testimony was that at approximately 9:00 A.M. on the morning in question she saw defendant Elvin Appleton in the motel office with a .45 caliber gun in his hand. There was no testimony that he was making any illegal or unlawful use of the gun in committing a robbery or an aggravated battery, that any money was taken or attempted to be taken, that he had illegally discharged the gun, that he was carrying a concealed weapon or that he was guilty of any other crime at the time and place in question. The actions described by the witness did not constitute any crime, only the objections and innuendoes of the defendants would make them so. We think that the People were careful in their presentation of the rebuttal testimony to prevent evidence of another crime involving the defendant Elvin Appleton from going before the jury. Defendants cite *People v. Fuerback*, 66 Ill.App.2d 452, 214 N.E.2d 330, but it is distinguished on its facts in that the rebuttal witness testified in great detail concerning another robbery at gunpoint, the description of the gun used and what the defendant did and said during the incident.

In the rebuttal portion of his closing argument the prosecutor, in commenting on the incident at the motel, said: "She [the maid] said under oath that Elvin Appleton was in her motel; whether another crime took place on that occasion isn't before you; it would be improper to tell you that a crime took place there, if in fact it did; it would be improper to tell you there was a charge pending, or not pending." But again, it was the defense who prompted and invited the reference to the incident in the motel. An attorney for defendant, in making his closing argument, said:

"Now, Mrs. McCondichie who works in a by-the-hour motel comes in and says there was a man. Isn't this strange? There was a man in an orange sweater in there with a black—that isn't black—but with a black .45. She knows what a .45 looks like—but a black .45. He looks like Elvin Appleton, even down to the goatee. You heard me ask—I don't think I took advantage of her, but she remembered that. She was positive. Mrs. Wicks and Mrs. Preuss couldn't identify anybody, but she was positive, that a man came in and displayed a .45, that is what she said. She didn't call the police. She called the boss. I don't know

how supposedly she got to view anybody in the line-up; she said two weeks later she identified Elvin Appleton. She didn't say that the man wanted money, that he just appeared in there with a .45.

How close the people who are interested in the operation of that so-called motel are connected with anyone in East St. Louis or anybody in the City, insofar as the police are concerned or anyone concerned with seeing that the laws are complied with down there, I don't know, but I do know that kind of testimony is unreliable in my opinion, but you have to be the judges."

It is apparent by his remarks that the State's Attorney was not trying to suggest to the jury that defendant, Elvin Appleton, had committed another crime; to the contrary, he was advising the jury that they should not consider it as such. The prosecutor's comment cannot be considered anything but a fair rebuttal to the remarks made by a defendant's attorney in his closing argument.

Defendants next contend that the court committed error in admitting in evidence the .45 caliber shell casing found at the scene of the robbery and the testimony of the ballistics expert as to its origin because it was not established that the shell casing found at the scene was the same shell casing examined or placed in evidence. In essence defendants' objection is that the People did not meet their burden of showing a continuous chain of possession in order to establish a foundation for admission of the shell casing in evidence; that there are "breaks in the chain" of possession.

The record shows that Sgt. Henderson found a .45 caliber shell casing at the scene and placed it in his pocket. When he arrived at the police station to make his report he turned it over to the Desk Sergeant on duty, Sgt. Lemanski, who gave him a receipt for it. Sgt. Lemanski placed the casing in a brown manila envelope and stapled it shut. He then made out an evidence sheet and attached a copy to the envelope and locked the envelope in the evidence drawer which was in a desk in the Desk Sergeant's office. The envelope containing the casing remained in the evidence drawer until the following morning, September 9. In keeping with customary practice, the key to the evidence drawer was in the possession of the Desk Sergeant and kept in an unlocked drawer of the Desk Sergeant's desk and passed to the relieving Desk Sergeant when the shift changed. There is traffic by police officers through the room in which the key to the evidence drawer is kept by the Desk Sergeant. On the morning following the robbery the evidence officer of the East St. Louis Police Department, Sgt. Holtman, went to the Desk Sergeant's office and took delivery of the evidence envelope from the Desk Sergeant on duty who removed it from the locked drawer. Sgt. Holtman

signed the evidence book to note receipt of the shell casing and the .45 caliber pistol taken from defendant Elvin Appleton. Sgt. Holtman delivered the shell casing and pistol to Sgt. Henderson who took them to Detective Joseph Brasser of the St. Louis Police Department. Detective Brasser was assigned to the St. Louis Police laboratory firearms identification section and performed identification tests on the shell casing and pistol and testified at the trial. After completing his tests Detective Brasser returned the shell casing and pistol to Sgt. Holtman who retained them in his possession until the time of the trial. Sgt. Brasser testified that the shell casing was fired from the gun which Elvin Appleton had in his possession when he was arrested.

Defendants contend that there is no way of telling that the shell casing examined by Detective Brasser and the one admitted in evidence was the same one found at the scene of the robbery since there was no testimony offered by the People as to what happened to the shell casing from the time Sgt. Lemanski went off duty at 3:00 P.M. and Sgt. Holtman went on duty the next morning at 8:00 A.M. Sgt. Gibbs, the Desk Sergeant who was on duty during those intervening hours was never called to testify and the evidence drawer was in an area accessible to other police officers. Defendants further contend that the question of chain possession is aggravated by the fact that neither Detective Henderson, nor Sgts. Holtman and Lemanski could say of their own personal knowledge that the shell casing offered in evidence was the same one they had delivered during their investigation.

Nothing appears in the record that would suggest tampering, alteration or substitution, either intentional or accidental, with the shell casing or the envelope containing it. We think the record discloses a careful, guarded and systematic procedure for handling items of physical evidence by the East St. Louis Police Department and that that procedure was followed with care in dealing with the shell casing in question. As stated in *People v. Hines*, 267 N.E.2d 696, the chain of possession was complete and the fact that certain other people had access to the exhibits at various stages of the possession would not effect the admissibility of the exhibits unless there was actual evidence of tampering or substitution. In *People v. Anthony*, 28 Ill.2d 65, 190 N.E.2d 837, there was a suggestion that the chain of possession was broken when there was no direct testimony from the man in the crime laboratory who actually received the sealed envelope from the arresting officer and placed it in a locked cabinet. The Supreme Court rejected the contention and approved a system of evidence preservation similar to that in this case. The procedure followed in the handling of the shell casing as an item of physical evidence to preserve its integrity as evidence finds full justifi-

cation in the cases dealing with the chain of possession of evidence. The fact that Desk Sgt. Gibbs, who had access to the key to the evidence drawer, was not called to testify, or that there was "traffic" in the room where the key was kept by other police officers with some opportunity to obtain access to the key to the evidence drawer does not constitute a break in the chain of possession so as to destroy the integrity of the evidence. (*People v. Belousek*, 110 Ill.App.2d 442, 249 N.E.2d 693; *People v. Hines, supra; People v. Cain*, 35 Ill.2d 184, 220 N.E.2d 195; *People v. Judkins*, 10 Ill.2d 445, 140 N.E.2d 663.) Under the circumstances shown the court was not in error in admitting the shell casing into evidence nor in permitting the ballistics expert to testify.

Defendants rely upon *People v. Norman*, 24 Ill.2d 402, 182 N.E.2d 188, and *People v. Maurice*, 31 Ill.2d 456, 202 N.E.2d 480. However, an examination of those cases discloses that the procedures there involved bear no relation to that shown in this case. In *Norman* it was held that a powder purporting to be narcotics lay unprotected on a chemist's desk for approximately nine days with no effective protection. In *Maurice* there was no link either by identification or continuity of possession between the heroin in evidence and the defendant.

■ Defendants' final contention is that the final argument of the prosecutor in which he called Elvin Appleton a "stick-up artist" was incompetent and prejudicial. Defendants made no objection to the remark at the trial and no ruling on its propriety was obtained or preserved so any error stemming therefrom is deemed to be waived. *People v. Donald*, 29 Ill.2d 283, 194 N.E.2d 227; *People v. St. Clair*, 27 Ill.2d 505; *People v. David*, 126 Ill.App.2d 114.

■ Inconsistencies that appeared in the evidence were duly presented to the jury for their consideration. Their verdict of guilty makes it evident that they were not persuaded by defendants' arguments in that regard. From our examination of the record we are convinced that the evidence, when considered as a whole, shows the guilt of defendants beyond a reasonable doubt and we are not willing to set aside the jury verdict.

For the reasons stated we are of the opinion that defendants were proven guilty beyond a reasonable doubt and that no prejudicial error intervened in their trial. The verdict of the jury who saw the witnesses and heard their testimony is amply supported by the record and will not be set aside.

Judgment affirmed.

EBERSPACHER, P. J., and MORAN, J., concur.