THE PEOPLE OF THE STATE OF ILLINOIS, Plaintiff-Appellee, *v.*
TOMMY LEE WILLIAMS, Defendant-Appellant.

First District (4th Division)　No. 77-1163

Opinion filed December 21, 1978.

James J. Doherty, Public Defender, of Chicago (Ira Churgin, Assistant Public Defender, of counsel), for appellant.

Bernard Carey, State's Attorney, of Chicago (Lee T. Hettinger, Joseph P. Quirk, and John J. Moran, Jr., Assistant State's Attorneys, of counsel), for the People.

Mr. PRESIDING JUSTICE JOHNSON delivered the opinion of the court:

Defendant, Tommy Lee Williams, was convicted of attempt robbery and murder (Ill. Rev. Stat. 1975, ch. 38, pars. 8—4, 9—1(a)(3)) and

sentenced to concurrent terms of 1 to 3 years, and 14 years to 14 years and 1 day. The issues presented for review are (1) whether defendant was proved guilty beyond a reasonable doubt, and (2) whether there was a fatal variance between the indictment and the proof at trial.

We affirm.

Lutherene Johnson testified that she lived in a third-floor apartment with her three young children. Vickie Dean and a woman named Sheila also stayed with her on occasion. On March 26, 1976, she went to a lounge about 10 p.m. with Vickie Dean where she saw Sheila and defendant. Before leaving the tavern, Sheila, who was a prostitute, asked her whether she could take Richard Yarber (the deceased) back to her apartment and try to get some money out of him. She then left the tavern at about 3:30 a.m. with Sheila and Yarber who was already drunk when she arrived at the tavern. When Yarber drove them back to the apartment, he was driving slowly and "wobbly." He parked the car near the front of the apartment. Her babysitter, Tony Gordon, left immediately upon their return. After a few drinks at the apartment, Sheila and Yarber went into the children's bedroom. At this time, defendant and Vickie Dean arrived at the apartment. Sheila then came out of the bedroom and said she had only gotten $4 from Yarber and left.

Defendant went into the bedroom, saying that Yarber had some money, and he was going to get it. Defendant closed the door, and she then heard some "bumping and struggling" noises. She also heard defendant tell Yarber to give him his money because he knew he had it, and Yarber replied that he did not have any. When she went into the bedroom and saw defendant strike Yarber in the face with his hand, she told him to stop because he was waking the children. Upon going into the washroom, she heard glass breaking from the bedroom. Defendant walked out of the bedroom and said that Yarber had jumped out of the window, although he had tried to hold him.

Johnson further testified that defendant then went outside into the alley and called to her to pour water out of the window to "scrub up the blood on the concrete." Defendant later returned to the apartment and told them to pack up food, dress the children, and go to his apartment and pretend they had been there for the entire weekend. This witness refused and called the police. Before the police arrived, Tony Gordon had returned.

Johnson further related she first told the investigating officer that deceased had come to the apartment with a person named Janet Austin, and that both had asked to use the bedroom to talk. She told police that shortly thereafter an argument started; she heard the sound of cracking glass; and Miss Austin ran out of the bedroom and left the apartment. She further told them she then called defendant, and he came over.

Vicki Dean testified that on March 26, 1976, she had been with Lutherene Johnson all day getting "high." They arrived at the lounge where she saw Marlo and Joseph who were friends of Johnson's. She left the lounge at about 3:45 a.m. with defendant and went to the apartment. Upon arriving there, Johnson was drinking, and she heard sounds from the bedroom like the rocking of a bed. Sheila came out of the bedroom, stated that Yarber only had $4, and left. Defendant then said the man had some money and he was going to get it. He went into the bedroom and she heard a lot of thumping sounds and then the sound of breaking glass. When she ran into the bedroom, she looked out the window and saw a man on the ground.

Defendant left the apartment and called up to throw some water down. He then returned to the apartment and suggested they take food and pretend they had been in his house all weekend. However, Dean said Johnson refused and called her mother before calling the police.

Officer Joseph Murphy testified that upon investigating the incident at about 5 or 6 a.m. he went to the third-floor bedroom and observed spots that appeared to be blood on the wall. He looked out the window of the bedroom and saw nothing in the alley immediately below the window. However, upon investigating the alley, he noticed several fragments of glass and immediately below the window there was a spot of what appeared to be blood. The officer identified a photograph that showed the body of the deceased lying adjacent to a garage in the rear of the building.

The officer testified he confronted Johnson and told her that the position of the body was inconsistent with the story she had given him. He had another conversation with her and thereafter arrested defendant.

At police headquarters, defendant was again advised of his constitutional rights, and he stated he was not in the apartment at the time Yarber (the deceased) went out the window. Defendant was also asked if he could explain the presence of what appeared to be bloodstains on the lower portion of his trousers and on his shoes. Defendant told police he got the bloodstains when he was trying to break up a fight between Yarber and two other individuals who were in the apartment. He denied either robbing or striking Yarber.

Officer Murphy further testified that upon leaving the building his partner found the deceased's billfold lying on the grass immediately off the sidewalk. The wallet contained identification but no money. There was also a bill of sale for a 1968 Chevrolet. A full description and vehicle identification number of the car was obtained, but the car was never found.

It was stipulated that the bloodstains taken from defendant's clothing matched the blood type of the decedent. It was also stipulated that the

cause of death was "multiple injuries" and an analysis of the decedent's blood showed 197 milligrams percent ethanol, about twice the amount required for legal intoxication.

Defendant testified he had lived with Lutherene Johnson for a period of time after her husband died, but they had broken up at her insistence several months before the incident. On March 26, he went to Johnson's apartment sometime after 11 p.m. When he arrived, Tony Gordon, Sheila, Lutherene and her children were present. At about 1 or 1:15 a.m., he took Lutherene and Sheila to the lounge. After being there a short time, Vickie Dean arrived.

While at the lounge, Johnson asked him for $5 to buy cocaine, but he told her he could only give her $1. Sometime later, Dean and Johnson had accumulated enough money and he took them to a location where Dean and Johnson bought cocaine. All three then returned to the lounge. At that time, he noticed Yarber (the decedent) sitting next to Sheila; friends of Johnson, he knew only as Marlo and Joseph, were also there.

Defendant stated that Johnson, Sheila, and Yarber left the lounge together, and Johnson told him to bring Dean, Marlo, and Joseph back to the apartment. Upon arriving there, Johnson and Tony Gordon were listening to the records. Johnson, Dean, Marlo, and Joseph started "snorting" cocaine. Several minutes later, Sheila came out of the bedroom and said Yarber had given her only $4 or $5. Defendant stated he went into the bedroom and asked Yarber if he had any more money, and he said no. Defendant told him if he had more he should give it up because they were about to "rip him off," and he should put on his clothes and leave.

At that time, Marlo came into the room and threw a sheet over Yarber; Johnson, Dean, and Sheila then began striking and kicking him. Yarber said he had more money in a wallet in his car; Joseph, Marlo, and Dean went downstairs to search the car. During this time, defendant was trying to get Yarber dressed and out of the apartment. However, Dean and Marlo came back to the apartment, rushed into the bedroom and started swinging at Yarber again. Yarber's face was bloody from the beating and he grabbed defendant, pleading for them not to hurt him any more. As defendant pulled everybody away, they all left the room except the children. Defendant was about to close the door when Yarber grabbed his clothes and dived out the window. Defendant testified he unsuccessfully tried to stop him.

Defendant stated he left the apartment, went downstairs and around to the alley where he found the victim still breathing. He yelled to Johnson and told her to call the police and an ambulance. He denied that any water was mentioned and denied touching the body or knowing how the body got by the garage.

When he returned to the apartment, Tony Gordon called on the

telephone and Johnson asked him to return to the apartment. He stated that everyone then collaborated and tried to think of a lie to tell the police. Johnson then called the police.

Defendant stated that when the police arrived he let them in and told them a man had jumped out the window. After the police talked to everyone, they told him he was under arrest for murder. Upon being taken to the police station, he related the same events as he testified to at trial. Defendant testified he did not want to lie to the police, but he was still in love with Lutherene Johnson and went along with whatever she said. He stated it was her idea that they should go over to his place with the children and food.

Officer Murphy testified in rebuttal that defendant never mentioned the names Joseph or Marlo.

Defendant first contends he was not proved guilty beyond a reasonable doubt. He asserts that Lutherene Johnson and Vickie Dean were not credible because they were "interested" persons, their testimony was inconsistent, and because of their low moral character and lifestyle. Defendant argues Johnson, Dean, and several others were attempting to rob the deceased at the time of his death, and their testimony must be judged by a different standard than that of an unconcerned person. (*People v. Williams* (1976), 65 Ill. 2d 258, 266-67, 357 N.E.2d 525, 529.) In *Williams*, a witness relied on by the State had agreed to make a statement only after the police informed him that he would be charged with murder. The court concluded he was, therefore, an "interested person" with a motive to implicate the defendant. It stated that where a witness has hopes of a reward from the prosecution, his testimony should not be accepted unless it carries with it an absolute conviction of its truth. In this case, however, neither Johnson nor Dean was threatened with being charged in the crime, and their testimony was neither impeached nor inconsistent.

Defendant argues their testimony failed to take into consideration the fact that deceased's car could not be located and, therefore, there must have been another person present whom they did not mention. However, defendant overlooks the fact that the car might easily have been taken by Sheila. She had the opportunity to take the keys, and she was apparently aggrieved because she had not been adequately compensated for an act of prostitution. Furthermore, the location of the car was not material to whether defendant was responsible for decedent's death.

Defendant also argues that Johnson's statement that he was about to leave when the police arrived was calculated to falsely incriminate him and could not be sustained by the other evidence. He points out she had testified that the police arrived immediately after her telephone call, but then stated that Tony Gordon arrived first even though she telephoned

him after talking to police. Defendant asserts that he therefore had ample time to leave had he wanted to, and the fact that he stayed indicates his innocence. That analysis, however, is not persuasive because defendant testified that Dean and Johnson agreed to tell the police that deceased jumped before defendant arrived. Thus, defendant could easily have believed he had nothing to fear from the police. He may also have postponed his decision to leave until it was too late.

Although defendant suggests that the State's witnesses are not to be believed because of their low moral character and lifestyle, which included the use of alcohol, drugs, and the condonation of prostitution, both testified consistently and they were not impeached by extrinsic evidence. Defendant, on the other hand, testified that he got blood on his sweater and pants when deceased embraced him and begged to be protected from the others who were assaulting him. However, Officer Murphy testified that the bloodstains were on the lower portions of defendant's trousers and shoes, and there was no mention of blood on his sweater. It is, thus, more likely that defendant got the bloodstains when dragging the decedent across the alley or while kicking him. It is also significant that none of the others had bloodstains on their clothing.

■■ Furthermore, defendant testified that deceased jumped through the window when, with the exception of the children, only the two of them were in the room. It is not probable that deceased would jump when the only man in the room with him was his protector. While there is no burden on defendant to prove his innocence, if he elects to explain the circumstances, it is incumbent upon him to tell a reasonable story or be judged by its improbabilities. (*People v. Neal* (1968), 98 Ill. App. 2d 454, 458, 240 N.E.2d 784, 786.) The trier of fact is not bound to believe the testimony of a defendant where the testimony is conflicting. (*People v. Manion* (1977), 67 Ill. 2d 564, 577-78, 367 N.E.2d 1313, 1320.) Defendant was proved guilty beyond a reasonable doubt. *People v. Akis* (1976), 63 Ill. 2d 296, 299, 347 N.E.2d 733, 735.

Defendant next contends the conviction must be reversed because there was a fatal variance between the indictment and the proof, and he was prejudiced because he was not adequately informed of the gist of the charge. The court found defendant guilty of count III of the indictment which stated:

"Tommy Lee Williams committed the offense of murder in that he:

\* \* \*

III. While attempting to commit a forcible felony, to wit: robbery, beat with his hands and threw him out the window and killed Richard Yarber, without lawful justification, in violation of Chapter 38, Section 9—1(a—3)."

Defendant argues there was no evidence that he threw deceased out the window as charged, and the court found him guilty of murder "while in the performance of a forcible felony." The felony-murder statute provides as follows:

> "Murder. (a) A person who kills an individual without lawful justification commits murder if, in performing the acts which cause the death:

> \* \* \*

>> (3) He is attempting or committing a forcible felony other than voluntary manslaughter."

Defendant argues there is substantial evidence that deceased jumped, based on his own spontaneous report to the others and on the fact that deceased was extremely intoxicated. Defendant also argues he was substantially prejudiced by the State's failure to prove the charges as alleged in the indictment. He asserts that in closing argument it was stated to the court that there was no evidence he threw the decedent out the window, thus, making clear his belief the State had the burden of proving the defendant's acts exactly as alleged.

However, the law does not sustain defendant's contentions. In *People v. Nelson* (1965), 33 Ill. 2d 48, 51-52, 210 N.E.2d 212, 214-15, the defendant contended there was a fatal variance between the indictment and the proof because he was charged as a principal for the crime of murder, and the proof, at most, indicated he was only an accessory before the fact. The court held that his contention could not be sustained because it was not necessary that the indictment describe the circumstances as they actually occurred, and it was sufficient if the accessory was charged with the illegal effect of the acts performed by him; defendant's actions, if proved, were sufficient to find him guilty.

The court also held that a variance would not serve to vitiate the conviction unless it was of such a character as to mislead the accused in his defense or expose him to double jeopardy. The court found that at no time during the trial or the motion for a new trial did counsel request additional time or assert that it was impossible for him to prepare an adequate defense.

In *People v. Simpkins* (1971), 48 Ill. 2d 106, 110-11, 268 N.E.2d 386, 388-89, defendants were charged with mob action in that they disturbed the peace by firing a gun. They appealed their convictions, arguing that a fatal variance existed between the complaint which charged disturbing the peace by firing a gun and the proof which showed that no gun was fired, but there was a gang fight. The supreme court held that the words "firing a gun" were surplusage and could be disregarded. The court held defendants were not prejudiced because they did not argue that any of their testimony was inaccurate or that they omitted to put before the

court any facts bearing upon their guilt or innocence. Furthermore, the complaints met the requirements of section 111—3 of the Code of Criminal Procedure of 1963 (Ill. Rev. Stat. 1975, ch. 38, par. 111—3) and set forth the name of the accused and the name, date, and place of the offense. The court stated that the particular means by which each defendant participated in the creation of the disturbance was not critical, and the fact that none of the individual defendants had fired a revolver was immaterial. See also *People v. Adams* (1977), 45 Ill. App. 3d 334, 359 N.E.2d 840.

■■ In this case the pleading clearly set forth the offense, stating there was a violation of section 9—1(a)(3), and there was also compliance with section 111—3. The fact that count III included the unnecessary allegation that defendant threw the decedent out the window is not significant and may be regarded as surplusage. Defendant's actions, as testified to by prosecution witnesses, were sufficient to find him guilty of murder under the statute. Although defendant contends he was prejudiced in the preparation of his defense, defendant does not claim he was induced to withhold evidence or that his testimony was inaccurate. We find there was not a fatal variance between the indictment and the proof.

For the foregoing reasons, the judgment of the circuit court of Cook County is affirmed.

Affirmed.

ROMITI and LINN, JJ., concur.