THE PEOPLE OF THE STATE OF ILLINOIS, Plaintiff-Appellee, v.
WILLIE DIXON, Defendant-Appellant.

First District   (2nd Division)   No. 1—90—0567

Opinion filed February 4, 1992.—Modified on denial of
rehearing April 28, 1992.

David W. Borenstein, of Alfred D. Stavros & Associates, of Wheeling, for appellant.

Jack O'Malley, State's Attorney, of Chicago (Renee Goldfarb, Randall Roberts, and Brian Clauss, Assistant State's Attorneys, of counsel), for the People.

JUSTICE SCARIANO delivered the opinion of the court:

Defendant Willie Dixon was employed as an officer of the Cook County sheriff's police department and was stationed in Maywood. On January 25, 1987, Superbowl Sunday, Dixon was working as a dispatcher. It is common practice for the sheriff's department to make audio tapes of on-duty dispatcher communications. At 12:24 p.m. Dixon received an anonymous call regarding illegal gambling at the Prime Minister Restaurant in unincorporated Northbrook. After taking the call, Dixon wrote a report on the complaint according to standard operating procedures.

Dixon then called the restaurant, and the following is a transcript of the taped conversation.

    "VOICE: Prime Minister.

    VOICE: Yes, is Gus there?

    VOICE: Someplace.

    VOICE: Can I speak to him, please? This is Dixon from Cook County Police.

    VOICE: Dixon, this is Tom.

VOICE: Huh.

VOICE: Tom.

VOICE: Yeah Tom, how you doing?

VOICE: All right.

VOICE: All right. We just got a—just—we just got a couple of calls about some things going on—

VOICE: Right.

VOICE: —you know what I'm talking about?

VOICE: Right, I don't have nothing here.

VOICE: Just—just make sure everything is covered, 'cause the wrong people might get a word of it. Okay?

VOICE: Okay.

VOICE: Just make sure everything is covered. All right?

VOICE: Right. (inaudible) call off the other part too in the strip.

VOICE: Huh?

VOICE: Call off the strips too?

VOICE: Anything that will point in that direction, kinda—kinda keep it under cover. Okay?

VOICE: Okay. We won't have nothing else?

VOICE: Yeah, just in case somebody comes—it—it—it—let me talk to Gus.

VOICE: Okay.

VOICE: Hello.

VOICE: Yeah, Gus.

VOICE: Yeah.

VOICE: Willie Dixon. How you doing?

VOICE: Okay, Buddy, what's up?

VOICE: We just got a couple of calls about you know what.

VOICE: Okay. Great, Thank you.

VOICE: Okay. Just, you know, keep everything under. .

VOICE: Everything. All right, 'cause the wrong folks might get word of it too, so—

VOICE: Thank you very much.

VOICE: Okay.

VOICE: Thank you, Buddy.

VOICE: All right.

VOICE: Bye.

VOICE: Bye.

VOICE: At the tone WFLD time will be 12:28 and 40 seconds."

Dixon then went on to radio codefendant, Officer Joseph Peluso:

"VOICE: 1295.

VOICE: 1295.

VOICE: Uh, make a premise check at the Prime Minister 3355 North Milwaukee. Uh, give me a call from that location. See Gus.

VOICE: 10.4. 10.4.

VOICE: Yeah, 95, if you're near the phone give me a call now.

VOICE: 10.4.

VOICE: —5 County.

VOICE: Go ahead. Go ahead.

VOICE: 22 Same, he's finally showed up.

VOICE: Is he gonna need any backup over there?

VOICE: Negative.

VOICE: 10.4.

VOICE: Yeah, Joe.

VOICE: Yeah.

VOICE: Yeah, they did—we just got a couple of calls in reference to you know what.

VOICE: Uh-huh.

VOICE: All right. Just in case the complainant is listening, you know, we've got to send somebody over there.

VOICE: Right.

VOICE: Okay. I already talked with Gus, but, just, you know, just stop in and say hello and, you know, whatever.

VOICE: Uh-hmm.

VOICE: You know, I already talked with Gus. I called Gus as soon as we got the call. So—

VOICE: Okay.

VOICE: Take care of it. All right.

VOICE: All right.

VOICE: All right. Bye.

VOICE: 12:30 and 20 seconds. At the tone—12:34 and 20 seconds."

Sometime later, David Stetler, then Chief of the Criminal Receiving and Appellate Division of the United States Attorney's Office in Chicago, began an investigation of Dixon and Peluso. Stetler began his investigation after being contacted by James Walsh, then Chief of the Cook County sheriff's police, who had received an anonymous letter regarding illegal gambling activities at the Prime Minister Restaurant. Acting on the information contained on the tapes, Stetler, an FBI special agent and an IRS special agent decided to interview

Dixon and Peluso. Stetler wanted to know not only if Dixon had been paid by the restaurant, but also if Dixon was involved in more than one isolated incident.

Five days after the conversations referred to above had been taped, Stetler and the other Federal agents called Dixon and went to his house in Wheeling to interview him. At trial Stetler testified that when they arrived, Dixon answered the door and invited them in. Following introductions, Stetler showed Dixon the anonymous letter and told him that a Federal investigation was being conducted into gambling that occurred at the Prime Minister Restaurant on Superbowl Sunday, January 25, 1987. Dixon then reviewed the letter, stated that he was familiar with the restaurant and its owner, Gus, but that he had spent Superbowl Sunday at a party downtown. When asked if he was aware of any gambling at the Prime Minister on Superbowl Sunday, Dixon "paused for a while, looked down, looked up, and said, 'no.' "

After Dixon denied knowing of gambling activities at the Prime Minister on Superbowl Sunday, Stetler told Dixon that he (Stetler) had a copy of the department's tape recordings made of the conversations of the on-duty dispatcher that day. Stetler went on to tell Dixon that the tape contained what the United States Attorney's office believed to be a conversation between Dixon and Gus, the owner of the Prime Minister. One of Stetler's colleagues then played a portion of the tape for Dixon. Only after the playing of the tape did Dixon state that he was aware of social gambling occurring at the restaurant. Stetler also testified that after playing the tape, Dixon "acknowledged that it was [Dixon] on the tape discussing what he discussed with Gus." Dixon also told Stetler that he never took money from the Prime Minister and that the event recorded on the cassette was a one-time favor.

On January 20, 1988, Dixon appeared before a Cook County grand jury, which indicted Peluso and him with the offense of official misconduct. (Ill. Rev. Stat. 1987, ch. 38, par. 33—3(b).) On March 28, 1988, Dixon filed a motion for discovery, a part of which contained a request for a bill of particulars. The State filed an answer to the request for a bill of particulars, but, on August 8, 1988, Dixon filed a "Motion to Dismiss Due to Insufficiency of Charge."

After a bench trial, Dixon was found guilty, and thereafter he filed a "Motion for New Trial and/or Motion in Arrest of Judgment," which the court denied. Dixon appeals, charging the trial judge with committing nine errors, only three of which merit our consideration.

### A

Dixon makes a two-part claim that not only does his indictment set forth separate acts and rule violations in such a manner that the wording of the one-count indictment is impermissibly duplicitous, but also that he should have been exonerated when the trial court found him not guilty of a portion of the indictment. The pertinent parts of the indictment read as follows:

"Willie Dixon and Joseph Peluso committed the offense of Official Misconduct in that they, in their official capacity as public employees, to wit: Cook County sheriff's police officers, knowingly performed an act which they knew they were forbidden by law to perform, to wit:

They failed to perform their assigned duties and obligations of law enforcement in a proper fashion; by failing to properly investigate a complaint of a gambling operation at the Prime Minister Restaurant, as required under Chapter 14 of the Cook County sheriff's police Department Rules and Regulations, to wit: 'Conduct regarding the performance of duty;' and Cook County sheriff's police Department General Order Number 86-35, 'Preliminary Investigations.'

Further, they revealed information, the effect of which indicated the existence of a complaint of gambling at the Prime Minister Restaurant, said information obtained in the course of their duties; to other parties including the subject of said complaint in a manner not required by law, duty or assignment, in violation of Chapter 14.29 of the Cook County sheriff's police Department Rules and Regulations, to wit: 'Department files and information.'

Further, they revealed, not in the proper discharge of their duties, the existence of information regarding an investigation aimed at the apprehension of criminals or the control or suppression of vice activities, to wit: They notified and warned the subject of a gambling complaint of information, the effect of which indicated the existence of a complaint of gambling operations at the Prime Minister Restaurant and imminent investigation, in violation of Chapter 14.32 of the Cook County sheriff's police Department Rules and Regulations, to wit: 'Information regarding suspected criminal or vice activity.' "

The pertinent provisions of the definition of official misconduct (Ill. Rev. Stat. 1987, ch. 38, par. 33—3) read as follows:

"A public officer or employee commits misconduct when, in his official capacity he commits any of the following acts:

***

(b) Knowingly performs an act which he knows he is forbidden by law to perform."

We shall treat first Dixon's allegation of duplicity. It is generally understood that "due process requires that an indictment or information must apprise the defendant of the nature and cause of the offense charged with sufficient specificity to enable him to prepare his defense." (*People v. Lee* (1978), 57 Ill. App. 3d 927, 930.) In support of his argument that the indictment set forth above does not apprise him of the nature and cause of the offense charged, Dixon cites *People v. Simmons* (1982), 105 Ill. App. 3d 402, 404, which holds that "when two or more offenses are charged in the same count, not from charging a single offense in more than one way or where different acts contribute to the same offense," duplicity exists.

It is Dixon's contention that the manner in which the indictment is worded, specifically the use of the word "further," charges him with three separate offenses: failure to properly investigate a complaint of gambling (in violation of General Order No. 86—35); revealing department files and information, in a manner not required by law, to the subject of a complaint (in violation of chapter 14.29); and notifying and warning the subject of a gambling complaint of information regarding an investigation of that complaint (in violation of chapter 14.32). Therefore, he could not know which charge the State would focus upon in its case against him. In support of this contention, he cites *People v. Woolfolk* (1973), 11 Ill. App. 3d 911, and suggests it is controlling. We do not agree.

In *Woolfolk* the State charged defendant with a violation of section 28—1(a)(8) of the Illinois Criminal Code (Ill. Rev. Stat. 1969, ch. 38, par. 28—1(a)(8)), and according to the indictment, defendant "set up and promoted, *** and sold, *** and offered to sell, *** and transferred, *** and knowingly possessed" gambling devices. Section 28—1(a)(8), however, makes it an offense to do any *one* of these acts, not all of them, since the statute uses the disjunctive "or" rather than the conjunctive "and," as was done in the indictment in *Woolfolk*. Consequently the *Woolfolk* court held that by charging defendant with the commission of all the acts, the indictment did not sufficiently notify defendant of the crime against him. *Woolfolk*, 11 Ill. App. 3d at 913.

■ The official misconduct statute, unlike section 28—1(a)(8), does not list the methods by which it may be possible to violate the statute. In the case at bar, the indictment charges Dixon with violat-

ing section 33—3 of the Criminal Code, and then goes on to list the ways in which the violation occurred. According to *People v. Ross* (1961), 21 Ill. 2d 419, 421, "[d]uplicity \*\*\* arises from charging more than one offense, and not from \*\*\* pleading different acts contributing to the ultimate charged offense."

Similarly, *People v. Clark* (1979), 71 Ill. App. 3d 381, 406, citing *People v. McMullen* (1948), 400 Ill. 253, 255, states that "[c]learly, separate offenses can be charged in different counts or in one count of one indictment if the offenses are part of a single transaction." Moreover, in order to support a conviction for official misconduct, the State must show, in part, that the law the defendant violated was specified in the indictment. (*People v. Locascio* (1985), 137 Ill. App. 3d 201, 205.) At oral argument, defense counsel acknowledged that the alleged violations occurred as part of one transaction; counsel also admitted that Dixon had been charged with only one offense. Thus, this part of Dixon's argument cannot be sustained.

■ Turning to the second part, Dixon posits that even if the indictment is not duplicitous, he nonetheless should have been exonerated when, he alleges, "the trial court found him not guilty of 'a material allegation,'" that is, the first paragraph of the indictment. We disagree. It is important to note that the trial judge did not find Dixon to be "not guilty" of the acts described in the first paragraph of the indictment; rather, he found that "paragraph one \*\*\* just does not apply to Mr. Dixon; [it] is directed not to Mr. Dixon, but to Mr. Peluso." Moreover, the first paragraph of the indictment is not a material allegation which must be proven by the State. (See *People v. Williams* (1978), 67 Ill. App. 3d 524.) As discussed above, Dixon was charged with the one offense of official misconduct, in such manner and form that the individual paragraphs of the indictment are not material allegations, but rather, are merely the delineated ways he committed official misconduct. Thus, to the extent that the first paragraph of the indictment does not apply to Dixon, it is surplusage and may be disregarded. (See *People v. Mullinax* (1979), 67 Ill. App. 3d 936.) Accordingly, Dixon's argument on this part also fails.

B

Dixon next complains that State's exhibits Nos. 2, 3, 4, and 8 were admitted into evidence without observing the proper foundational requirements and that therefore this evidence should have been excluded. These exhibits were the two sets of the master reel-to-reel tape-recorded conversations and two cassette copies of the master tapes.

At trial there was much testimony about how the Department's taping machine works and how copies of the master tapes were made. The machine uses a 20-channel recorder that records all dispatcher communications. Two copies are made of the same conversation; one copy is made as a backup. The relevant information for this case was contained on three or four tracks. Therefore, in order to put together the information in some sort of chronological order, some editing of the tracks was necessary.

The authenticity of both the masters and the copies was questioned by the defendants. The prosecution claimed that State's exhibit No. 8 was a near-complete copy of the relevant events from the master tape. The defense, however, claimed that the copies were missing pieces of information from the master tapes. There was also considerable chain-of-custody testimony relating to both the master and copied tapes. Eventually, the court admitted into evidence both versions of the master tapes (State's exhibits Nos. 3 & 4), one near-complete copy of the master tape's relevant information (State's exhibit No. 8), and one copy, the completeness of which was uncertain (State's exhibit No. 2).

Anthony Cirincione, communications engineer for the Cook County sheriff's police, testified as to how the tape machine operates, describing the way in which the time stamp operates and how it would be impossible to tamper with the master tapes without the time stamp showing the alterations. He also testified that these tapes would record continuously for a 24-hour period of time per reel. After this time, communications personnel, usually the watch commander, would take the tapes off the machine and put them in the unlocked radio room cabinet. Sometime on January 26, 1987, Cirincione was ordered to make a cassette of the January 25, 1987, tapes. When he obtained the tapes, they had been in the unlocked cabinet since approximately 12 a.m. on January 26, 1987.

Cirincione testified that he took the master tapes and made three cassette copies; the first two were made for practice and hence were incomplete. The third tape (State's exhibit No. 8), however, included what Cirincione considered to be nearly all the information regarding the requested transaction. Upon completing this task, Cirincione placed the master tapes in his personal locker, for which he had the only key. He then gave the third cassette (exhibit No. 8) to Lieutenant Peters, Cirincione's superior, and returned the master tapes to him 45 minutes later. On re-cross-examination, Cirincione testified that it was not his job to protect the chain of custody.

Judy DeJohn, secretary of the internal investigations unit of the Cook County sheriff's police, testified that the master reel-to-reel tapes were kept in a locked filing cabinet in John Ritter's office from January 28, 1988, until October 11, 1988. There existed six copies of keys which fit this locked cabinet. The record does not indicate how the tapes got into the locked cabinet. When Investigator Miller of the United States Attorney's office came to get the tapes in October of 1988 to listen to them, he signed a receipt for them. Ms. DeJohn also testified that within 1 and 1½ hours, the tapes were again in the locked cabinet.

Citing *People v. Estrada* (1980), 91 Ill. App. 3d 228, and M. Graham, Cleary & Graham's Handbook of Illinois Evidence §901.6 (5th ed. 1990), Dixon claims that the above-described testimony is insufficient to meet the foundational elements necessary for admitting tape recordings into evidence, for the reason that the State did not establish a proper chain of custody regarding the master tapes. Dixon further maintains that the chain was broken because there were many keys unaccounted for that would open the cabinet which contained the tapes, and that there appeared to be no one person whose job it was to maintain the custody of the tapes. Therefore, he concludes, the master tapes could have been tampered with, without its being reported, since no formal inventorying process was used. Dixon also claims that there was no proper chain of custody for the two copies made of the master tapes as well, specifically, that it was never shown that additions, deletions, or changes had not been made, or that the recordings (exhibits Nos. 2 and 8) were preserved in any reliable manner. We disagree.

■ "[A] trial court's ruling on the sufficiency of a chain of custody is subject to reversal only for an abuse of discretion [citation]." (*Williamson v. Police Board* (1989), 182 Ill. App. 3d 304, 310, *appeal denied* (1989), 127 Ill. 2d 644.) We do not find any such abuse. In order to establish a satisfactory chain of custody, the proponent must show to a reasonable probability that the evidence has not been subject to tampering, and that reasonable protective measures were taken—it need not remove all possibility of tampering. Moreover, a defendant's speculations are insufficient to support a claim of tampering. (*People v. Hermann* (1988), 180 Ill. App. 3d 939, 945, citing *People v. Martine* (1984), 121 Ill. App. 3d 793.) However, the more the authentication is genuinely in issue, the greater the need to negate the possibility of alteration, substitution, or change of condition. *People v. Judkins* (1957), 10 Ill. 2d 445.

Our review of the testimony set forth above persuades us that the trial court did not abuse its discretion in admitting the disputed tapes into evidence. More important, the record plainly establishes that, despite his previous denials, Dixon was aware that gambling was going on at the Prime Minister, and that he admitted that the event recorded on the cassette that was played for him by the Federal agents—the incident for which he was tried—did in fact occur and was a one-time favor. Accordingly, the defendant's argument as to this issue must also be rejected.

### C

Dixon further contends that the trial court abused its discretion by not granting his motion to strike Stetler's testimony because of an alleged discovery violation. Stetler first testified that he did not make any type of memorandum of the conversation that he had with Dixon. However, when Stetler was recalled the next day, he testified that he "had various materials, including photographs, the tape. [He] wrote a letter to Frank Debony [not further identified in the record] about it and so forth. [He] had [his] secretary prepare a transcript which *** would probably be laying [sic] in the file."

The parties appear to be somewhat confused as to precisely what the issue is here. Dixon claims that a formal file exists regarding Stetler's thoughts and theories pertaining to the case against him. The State, however, claims that no formal file exists and that what is at issue is some type of "transcript," the contents of which are not disclosed in the record.

In his discovery motion Dixon requested the production of the material from the States Attorney's office,[1] but it was not produced. At trial Dixon's counsel requested sanctions against the State's Attorney for failure to deliver the material, and at the close of the prosecution's case, Dixon's counsel made a motion to strike Stetler's testimony. The court reserved ruling on the request for sanctions and denied the motion to strike. When the court asked Assistant State's

---

[1]The record reflects that Dixon requested the reports in his discovery motion. In response to his request the court merely stated, "Get him the reports and I will decide on sanctions. You will have them tomorrow. Let's proceed." Yet, no further steps were taken by Dixon to ensure receipt of the reports. Moreover, at the close of the State's case, Dixon's attorney stated to the court, "on at least three occasions and as late as last night you directed the State's Attorney of Cook County to get us the reports. They have not—."

Attorney Wynne why his office did not comply with the discovery request, he said:

"I am prepared to argue that we did not ever get those things that were spoken about. In fact, on very diligent inquiry by me and my predecessors, we were told they [the United States Attorney's office] never had them. After I found out from Dave Stetler on cross examination there was some kind of file, I talked with a supervisor at the U.S. Attorney's office, complained vehemently. He said he would never disseminate [*sic*] that type of order."

Dixon argues that there was no valid reason given by the State as to why the file could not be produced and it was therefore an abuse of discretion for the trial court to allow Stetler's testimony to stand. He cites *People v. Weaver* (1982), 92 Ill. 2d 545, 559, for the proposition that "[a] reviewing court will find an abuse of discretion, however, when a defendant is prejudiced by the discovery violation and the trial court fails to eliminate that prejudice." Dixon claims to have been prejudiced in that (1) Stetler was the only prosecution witness who testified regarding purported incriminating statements made by Dixon; (2) it was through the testimony of Stetler that the unauthenticated tapes were first played; and (3) had the file been properly tendered to Dixon, his counsel could have more effectively cross-examined Stetler.

■ We note, however, that it was a witness (David Stetler of the United States Attorney's office), and not the prosecutor (the assistant State's Attorney), who failed to disclose the evidence in response to a specific request. We fail to perceive how it is the responsibility of the State's Attorney to obtain information which is in the possession of the United States Attorney. In addition, the United States Attorney's office was never served with a subpoena to produce this information; rather, the discovery motion was directed to the State's Attorney. Nonetheless, the State's Attorney's office attempted to obtain the material which the record indisputably shows was in the control of the United States Attorney, and this is all the State's Attorney's office could have done. Under these circumstances, the State's Attorney's office cannot be charged with a discovery violation.

Nor was the trial court in error for refusing to strike David Stetler's testimony. In order for the United States Attorney's office to be guilty of a discovery violation for failing to disclose the materials in question, it needed to have been properly served with a subpoena. Accordingly, the United States Attorney's office had no duty

to produce the material in question, and the trial court was correct in not striking Stetler's testimony.

Moreover, in order to establish a due process violation regarding suppression of evidence, defendant must demonstrate: (1) that the evidence was favorable to him; (2) that the prosecutor failed to disclose the evidence in response to a specific request; and (3) that the evidence was material. (*People v. Velez* (1984), 123 Ill. App. 3d 210, 216-17, citing *Brady v. Maryland* (1963), 373 U.S. 83, 10 L. Ed. 2d 215, 83 S. Ct. 1194.) Pursuant to the holding in *Brady*, materiality means that the omitted evidence would tend to raise a reasonable doubt of defendant's guilt. (*Velez*, 123 Ill. App. 3d at 217.) It is not enough that the evidence might have helped defendant's case; "[r]ather, at the very least, to be considered material, the evidence must reasonably be expected to affect the outcome of the case." *Velez*, 123 Ill. App. 3d at 217, citing *People v. Penland* (1978), 64 Ill. App. 3d 656, 661.

Dixon, however, nowhere alleges that the information contained in the records was favorable to him. There was also no allegation that the information in the records is material to his case. Even if we were to assume that a discovery violation occurred here, Dixon fails to show prejudice, for reversal is not warranted where a discovery violation does not prejudice the defendant (*Velez*, 123 Ill. App. 3d 210), and it is the defendant's burden to show such harm. (*People v. Curtis* (1986), 141 Ill. App. 3d 827, 832, *cert. denied* (1987), 480 U.S. 932, 94 L. Ed. 2d 744, 107 S. Ct. 1584.) In sum, in the case at bar, we are not offered any indication by Dixon that the transcript or file was favorable to him, or that it was material to his defense, or that it would have subjected Stetler's testimony to effective attack. Any possible impeachment would have gone only to collateral matters; it would not have undermined to any degree the formidable evidence which showed that Dixon had warned the Prime Minister that the police had been dispatched there and to hide all evidence of a gambling operation before they arrived. *People v. Enoch* (1988), 122 Ill. 2d 176, 194, *cert. denied* (1988), 488 U.S. 917, 102 L. Ed. 2d 263, 109 S. Ct. 274.

For the above-stated reasons, the judgment of the circuit court is affirmed.

Affirmed.

HARTMAN, P.J., and McCORMICK, J., concur.